Filed 3/12/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| In re VICENTE BENAVIDES FIGUEROA | ) ) | |
| on Habeas Corpus. | ) ) | S111336 |
| | ) ) ) | Kern County Super. Ct. No. 48266 |
| _____ | ) | |

On appeal we affirmed petitioner's convictions and death penalty judgment. (*People v. Benavides* (2005) 35 Cal.4th 69 (*Benavides*).)  In response to his petition for habeas corpus relief, we issued an order to show cause on his claims that his convictions were based on false evidence and that he received ineffective assistance of counsel. Respondent[1] now concedes that false evidence was introduced at trial and that petitioner's convictions of substantive sexual offenses, special-circumstance findings, and judgment of death must be vacated.  Respondent urges us to reduce the murder conviction from first to second degree.  We decline to do so.  The judgment is vacated in its entirety.

---

[1]      As the custodian of petitioner's confinement, respondent is the Secretary of the Department of Corrections and Rehabilitation.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. *Procedure*[2]

Petitioner was found guilty of murder[3] committed with three special circumstances of felony-murder rape, sodomy, and lewd conduct.[4] Petitioner was also convicted of the substantive crimes of rape, sodomy, and lewd conduct[5] with the infliction of great bodily injury during those offenses.[6] The jury returned a verdict of death. Following our issuance of an order to show cause, the parties completed briefing on March 14, 2017.[7]

## B. *Trial Evidence*

A more thorough factual recitation can be found in *Benavides*, *supra*, 35 Cal.4th at pages 79-86. This summary is limited to the false evidence issue.

### 1. *Consuelo's Hospitalizations*

The victim was 21-month-old Consuelo Verdugo. Her mother, Estella Medina, and petitioner brought Consuelo to a hospital emergency room at Delano Regional Medical Center (DRMC) on the evening of November 17, 1991. They reported that Consuelo had been running after her older sister and hit her head on a door. Consuelo was limp and minimally responsive to external stimulation. She moved her arms and legs

---

[2] The procedural background is largely taken from the automatic appeal. (*Benavides*, *supra*, 35 Cal.4th at pp. 79-86.)

[3] Pen. Code, § 187; all unspecified section references hereafter are to the Penal Code.

[4] § 190.2, subd. (a)(17)(C), (D), (E).

[5] §§ 261, subd. (a)(2), 286, subd. (c), 288, subd. (a).

[6] § 12022.8.

[7] The petition was initially filed on November 11, 2002, by the Habeas Corpus Resource Center (HCRC). In February 2006, HCRC director Michael Laurence learned that a former HCRC investigator, Kathleen Culhane, had fabricated declarations in another case. An investigation revealed that she had fabricated numerous declarations in this case as well. On April 22, 2008, HCRC filed the operative pleading, denominated "Corrected Amended Petition for Writ of Habeas Corpus," and a set of revised exhibits.

and withdrew from pain, but did not appear to recognize her mother. She had a small bruise on her forehead, with scrapes on her nose and lip. Medical personnel focused on Consuelo's head injury and did not do a complete examination of her genitalia. When trying to insert a catheter, medical personnel noted mild redness on her vagina. Catheter insertion would prove difficult and was repeatedly unsuccessful.

As Consuelo's condition worsened she became comatose and was transferred to the Kern Medical Center (KMC). The receiving charge nurse noted Consuelo had "blown pupils," often seen incident to blunt force trauma from an auto accident. (*Benavides*, *supra*, 35 Cal.4th at pp. 79-80.) Consuelo's distended abdomen was the immediate focus of attention at KMC. Attempting to insert a catheter, the charge nurse noted a nearly quarter-sized bruise on Consuelo's external genitalia and a tear extending from her urethra to vaginal opening. A KMC emergency room physician, also trying to insert a catheter, superficially examined Consuelo's genital and anal areas.

Within twenty minutes of her arrival, Consuelo's abdomen had become greatly distended. Diagnostic surgery revealed her bowel, duodenum, and pancreas were "cracked in half," with portions of each resting on either side of her spine. The surgeon testified these injuries could have been caused by a kick or punch to the abdomen. He also noted scars and other indicia of prior injury between Consuelo's colon and liver. These injuries were one to two months old. (*Benavides*, *supra*, 35 Cal.4th at p. 80.) He did not know whether Consuelo had been sexually assaulted.

The morning after surgery, Consuelo was evaluated by pediatrician Jess Diamond. A thorough examination revealed a tear in Consuelo's hymen, a bruise on her perineum, swelling around her anus, and a lack of rectal tone. Dr. Diamond testified these injuries could result from "acute rape." Based upon the subsequent autopsy report of Dr. James Dibdin, Dr. Diamond testified that Consuelo had suffered a tear to her vaginal wall. That injury could explain the difficulties with catheter insertion. Dr. Diamond acknowledged that Consuelo had suffered a blunt force injury to her abdomen, but explained that

3

sodomy could have caused the injuries to her abdominal organs if the "penetrating force . . . rupture[d] the . . . rectum, then push[ed] the internal organs aside" until reaching the pancreas and duodenum, splitting them apart. Even if an external blow caused Consuelo's abdominal injuries, however, Dr. Diamond still believed that she had been sodomized.

On November 19, 1991, Consuelo was transferred to UCLA Medical Center (UCLA). Upon arrival, her entire body was swollen. She was oozing blood, and kidney function had ceased. Doctors performed a second surgery. The surgeon closely examined Consuelo's anus and saw no tearing. He explained that his inability to detect tearing could have been due to the extensive swelling. (*Benavides*, *supra*, 35 Cal.4th at p. 81.) The surgeon testified that nothing in Consuelo's medical records was inconsistent with sexual abuse.

Consuelo died on November 25, 1991.

2.      *The Forensic Pathology Report*

The forensic pathologist, Dr. Dibdin, listed Consuelo's cause of death as "blunt force penetrating injury of the anus," with the anus expanded to seven or eight times its normal size. He testified that Consuelo suffered anal lacerations along with injuries to her internal organs, including her bowel and pancreas. Dr. Dibdin noted abrasions to the vagina and anus, as well as healing injuries to the genital and anal region, suffered approximately four weeks earlier. (*Benavides*, *supra*, 35 Cal.4th at p. 81.) He testified that there was a tear in the back wall of the vagina that a catheter, with its soft tip, could not have caused. Consuelo had five fractured ribs, which Dr. Dibdin believed were caused by tight squeezing during a sexual assault. Swelling of her brain indicated she had been shaken. Dr. Dibdin testified the anal injuries were consistent with penile penetration causing acute lacerations and direct abdominal injury. He also noted evidence of healing rib fractures that were three to four weeks old. (*Benavides*, at p. 81.)

4

## II. EVIDENCE LEADING TO ISSUANCE OF ORDER TO SHOW CAUSE

### A. *Questions About Attribution of Injuries*

Petitioner asserts that false evidence, now repudiated or undermined, resulted in his convictions for rape, sodomy, lewd conduct, and murder and the special circumstance findings. Specifically, he claims Dr. Dibdin's theory that Consuelo's injuries were caused by anal penetration was both false and medically impossible. Petitioner alleges that evidence showing that Consuelo suffered injuries to her genitalia and anus was also false and misleading.

Petitioner contends that, contrary to trial evidence, Consuelo showed no signs of sexual assault when examined at DRMC, the first hospital where she received care. Her injuries can instead be attributed to medical intervention, including repeated failed efforts to insert a catheter, use of an adult-sized Foley catheter rather than a more appropriately sized device, rectal temperature taking, use of paralytic medication, and physical examination. Nurse Anita Caraan Wafford, who helped treat Consuelo when she was brought to DRMC, executed a declaration in support of the petition. She explained no one at DRMC noted any anal or vaginal trauma.

Dr. William A. Kennedy II, an expert in pediatric urology, opined in support of the petition that, "to a high degree of medical certainty" Consuelo had not suffered anal or vaginal penetration. Had vaginal or anal tearing been sustained in the hours before treatment, "Consuelo likely would have been bleeding noticeably by the time she arrived at the hospital." He added that "[t]his is especially true if . . . penetration by a penis or [other] object were so severe as to have violated her . . . abdominal cavity as proposed by Dr. Dibdin." Dr. Kennedy opined that DRMC medical staff had had ample time to observe Consuelo's genital area while taking her temperature rectally and trying to insert a catheter. After exhaustively reviewing Consuelo's medical records, Dr. Kennedy noted that DRMC medical staff saw no bleeding or other genital trauma, "indicat[ing] that she did not sustain injury to her genitalia or anus prior to her arrival."

5

Two doctors who treated Consuelo at UCLA, the final hospital to which she was admitted, reviewed all of the medical records. They declared anal penetration could not have been the cause of death because the organs between the anus and upper abdomen were not injured. Dr. Rick Harrison, the physician in charge of Consuelo's care at UCLA, believed that the cause of death given by Dr. Dibdin was anatomically impossible. Dr. Harrison explained, "Given the location of [Consuelo's] injuries they could not have physically been caused by a grown man's penis because had she been injured in such a manner the surgeons would have seen injuries to her rectum and colon and other physicians and nurses treating her would have likely seen tears to and bleeding from her rectum."

In addition to injuries caused by numerous medical interventions, abnormalities to the anal and genital region subsequently noted at KMC and UCLA can be attributed, in part, to systemic edema: bodywide swelling due to disseminated intravascular coagulation (DIC). DIC causes an inability to clot, leading to uncontrolled bleeding and swelling. Consuelo developed this condition soon after the exploratory surgery at KMC. Dr. Harrison explained that "[b]ecause her body was so swollen, [he] was not able to fully examine her genitalia or rectum to confirm the sex abuse findings of the medical staff at KMC. Had Consuelo sustained" those injuries from penile penetration, he "would have expected that [they] would have been visible despite the swelling." He saw no such injuries.

Dr. Diamond, the KMC child abuse expert who examined Consuelo the morning after her surgery, did note a tear to her hymen and perineum bruising. However, Dr. Kennedy explained that, in patients with DIC, bruising and tearing from even minor touching or movement are common because the skin becomes very fragile. The genital region is comprised of more delicate skin than other areas of the body. It "deteriorates more quickly and noticeably than the surrounding tissue." The bruises and tears noted on Consuelo's anus and genitalia were likely caused by repeated attempts at catheterization.

6

Dr. Kennedy noted that the "likelihood of unintentional injury from digital manipulation [of the genitals] is heightened in nonresponsive children." The anal tearing could have been caused by rectal temperature-taking, Dr. Diamond's examination, or even a bowel movement.

Notably, these injuries were not seen during Consuelo's treatment at DRMC. In support of the petition, a nurse explained that "[t]here are no indications of trauma to [Consuelo's] genitalia and anus on her chart because no one who treated [her] that night at DRMC saw any, even though we had the time and opportunity to do so."

Consuelo's genital and anal region was photographed at UCLA. The photos show extensive swelling due to DIC, but no tears to her genitalia or anus. Dr. Kennedy explained that, had she suffered a sexual assault four days before, the photographs would have shown the tearing that she was alleged to have suffered. Indeed, any severe tears would have worsened as a result of her critical condition because edema would have stretched the skin, making lacerations appear more pronounced. According to Dr. Kennedy, the photos showed no tears of even a minor nature. This suggests that the tearing noted during Dr. Dibdin's autopsy had resulted from medical interference or postmortem manipulation.

Finally, Consuelo's lack of rectal tone, initially attributed to a penetrating injury, was instead the likely result of paralytic medication she had been given, along with her extensive treatment and surgeries. Dr. Kennedy explained, "Anal sphincter laxity is a well-known side effect of" paralytic medications. No anal sphincter laxity or other anal injury was seen at DRMC, as would be expected if she had suffered penile penetration.

B.    *Recanted Testimony*

Many of the medical professionals who testified at petitioner's trial subsequently recanted their testimony. A comparison between witnesses' trial testimony and their later declarations is striking. Dr. Harrison, from UCLA, originally testified that the injuries he

7

saw may have been caused by penile anal penetration. He later declared that he had not been given Consuelo's DRMC medical records or the autopsy report before testifying. "Had [he] seen [all of Consuelo's] records and been asked to opine on the cause of death offered by the pathologist, [he] would have testified that it was anatomically impossible." Similarly, Dr. Leonardo Alonso, a medical resident who treated Consuelo at KMC, unequivocally testified that he believed Consuelo had been sexually assaulted. He subsequently declared that he had not reviewed Consuelo's initial medical records either before treating her or before testifying. After reviewing the records he no longer believed that Consuelo suffered a sexual assault on the day of her admission.

Dr. Diamond, the child abuse expert who evaluated Consuelo at KMC, testified at trial that the appearance of Consuelo's anal region was consistent with penetration by an object larger than a finger. He subsequently declared that "it is now my opinion to a high degree of medical certainty that Consuelo was not raped or sodomized." Dr. Nat Baumer, a medical expert, testified for the defense and admitted that reputable physicians concluded that Consuelo had been sexually assaulted. Dr. Baumer later unequivocally declared that the child "was not anally or vaginally penetrated." Dr. Anthony Shaw, a UCLA surgeon, testified that it would be improper to conclude based on his postoperative notes that Consuelo had not suffered a sexual assault. He subsequently declared that he had not been given Consuelo's complete medical record before testifying and "[c]onsequently, [his] testimony supported the prosecution's allegations that Consuelo had been anally penetrated with a penis which, based on [his] own observations, [he] could not support." The pleadings provide no explanation of why the full medical records had not been provided to these witnesses.

Others who provided related testimony later declared that they did not see evidence of sexual trauma or did not believe the purported cause of death by anal penetration was medically possible. Dr. Jack Bloch, a KMC surgeon, testified that he did not know whether Consuelo's internal injuries could have been caused by anal

penetration. His declaration states that, had he been given Consuelo's DRMC medical records before testifying, he would have stated "to a high degree of medical certainty, that Consuelo was not anally or vaginally penetrated . . . in the hours prior to admission at DRMC." Wafford, Consuelo's nurse at DRMC, declared, "[W]e never had any concern that Consuelo had been the victim of any type of sexual assault." Frances Zapiain, an ER technician at DRMC, initially testified that she did not believe Consuelo suffered sexual abuse and subsequently declared that she did not notice any indication of sexual assault when assisting with a failed catheterization. Dr. F. Warren Lovell, a forensic pathologist retained by petitioner, declared that had he reviewed Consuelo's complete medical history before trial he "would have testified that there was no indication in her medical records which would lead [him] to suspect that Consuelo had been vaginally or anally penetrated with a penis . . . on the night of November 17, 1991." Dr. Ann Tait, the ER doctor at DRMC, declared that neither she nor the nurses saw any sign of trauma to indicate sexual abuse, although they had ample opportunity to do so.

The sole medical professional who testified about sexual assault but did not subsequently recant his testimony was Dr. Dibdin, the forensic pathologist. However, his testimony was called into serious doubt by those who did recant. Indeed, the only remaining medical professionals who did *not* execute declarations in support of the petition were those who generally offered no testimony as to the purported cause of death or alleged sexual assault.

Dr. Diamond twice recanted his trial testimony. First, he disavowed his trial conclusion of vaginal penetration. He had testified that he saw a small tear to Consuelo's hymen. In conjunction with the tear Dr. Dibdin noted, Dr. Diamond concluded Consuelo had been penetrated. His conclusion was bolstered by his inability to obtain a urine sample following catheterization. In fact, Consuelo had been catheterized during her recent surgery and was becoming incapable of producing urine due to kidney failure.

9

Dr. Diamond testified that he passed catheters directly into the abdominal cavity through the tear in Consuelo's vaginal wall noted in the autopsy report.

After reviewing the medical records, autopsy report, and declarations supporting the petition, however, Dr. Diamond no longer believed that Dr. Dibdin's finding of vaginal wall tearing could be substantiated. Accordingly, Dr. Diamond recanted that portion of his testimony. Respondent has conceded that petitioner's rape conviction and special-circumstance true findings are no longer supported by substantial evidence.[8]

In 2012, Dr. Diamond submitted a second declaration more fully recanting his testimony. After consulting with Dr. Astrid Heppenstall Heger, M.D., F.A.A.P., whom he characterized as "the pre-eminent expert in the field of child sexual abuse and sexual assault," Dr. Diamond disavowed his opinion that Consuelo had suffered anal penetration. Dr. Diamond now believes, "to a high degree of medical certainty," that Consuelo's abdominal injuries did not result from anal penetration by a penis or similar object.

Dr. Heger herself provided a declaration in support of the petition. After reviewing medical records, testimony, and declarations, she concluded death due to blunt force penetrating injury of the anus "is so unlikely" that it reaches "the point of being absurd." Dr. Heger explained that the cause of death attributed in this case has never "been reported in any literature of child abuse or child assault. Had it occurred" here "it would be a unique and singular noteworthy incident in the annals of pediatric child abuse literature."

III.    EVIDENCE AND CONCESSIONS FROM RETURN AND TRAVERSE

Respondent's return to the order to show cause included declarations from experts in forensic pathology and child abuse. Both opined that Consuelo's genital and anal

---

[8]    Petitioner also asserts that false evidence was presented regarding Consuelo's rib fractures, loss of oxygen to the brain, and health history. Resolution of these assertions is not necessary to our conclusion that relief should be granted.

10

injuries were related to her deteriorating condition and that the purported cause of death by anal penetration was incorrect. These experts declared that Consuelo did suffer a deadly abdominal injury.

Petitioner submitted one further exhibit in support of his traverse. Deputy Attorney General Kelly LeBel interviewed Dr. Tracey Corey, the forensic pathology expert who signed a declaration in support of the return. A transcript of that interview cast further doubt on Dr. Dibdin's autopsy report. Dr. Corey was "embarrassed about the pathologist because what he says isn't even . . . anatomically possible." She elaborated, "I'm embarrassed that . . . a pathologist didn't know better, didn't know anatomy better."

Dr. Corey also clarified that elements of Dr. Dibdin's testimony were demonstrably incorrect. For example, Dr. Dibdin testified that he had examined autopsy slides of Consuelo's anal tissue. Dr. Corey explained Dr. Dibdin's testimony was necessarily inaccurate. The alleged anal tissue was patently from the large intestine.

Respondent concedes petitioner is entitled to relief based upon the introduction of false evidence. Respondent agreed that the "validity . . . of the evidence presented at trial ha[d] been so undermined by subsequent revelations," that, "as a matter of state statutory right," "[petitioner] is now entitled to limited relief." He concedes that petitioner's rape, sodomy, and lewd conduct convictions were no longer supported by substantial evidence and must be vacated, along with the corresponding special circumstance findings and sentence of death. He maintains, however, that the murder conviction should stand.

## IV. DISCUSSION

### A. *Legal Principles*

A defendant's right to seek habeas corpus relief is enshrined in California's Constitution. (See Cal. Const., art. I, § 11; *People v. Duvall* (1995) 9 Cal.4th 464, 474 (*Duvall*).) A habeas corpus remedy may be available when relief by direct appeal is inadequate. (*In re Sanders* (1999) 21 Cal.4th 697, 703-704). Habeas relief may be warranted when the invalidity of a judgment is not apparent from the record on appeal.

11

(*In re Robbins* (1998) 18 Cal.4th 770, 777; see also *In re Reno* (2012) 55 Cal.4th 428, 450.)

"Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*Duvall*, *supra*, 9 Cal.4th at p. 474.) This court evaluates a petition "by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief. [Citations.] If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause]." (*Id.* at pp. 474-475.)

If an order to show cause issues, the respondent, as "the custodian of the confined person," "file[s] a responsive pleading, called a return, justifying the confinement. (§ 1480.)" (*Duvall*, *supra*, 9 Cal.4th at p. 475.) The respondent addresses those issues identified in the order to show cause, and must allege facts " 'tending to establish the legality of petitioner's detention.' " (*Id.* at p. 476.) The petitioner thereafter files a traverse, "and this interplay frames the factual issues." (*Id.* at p. 477.) Facts "in the return that are not disputed in the traverse are deemed true." (*Ibid.*) When the return effectively acknowledges or "admits" allegations that justify relief, it may be granted without a hearing on the other factual issues contested in the pleadings. (*Ibid.*) Should the court conclude there are factual issues in dispute, "it may appoint a referee and order an evidentiary hearing." (*Id.* at p. 478.) An evidentiary hearing is not required if " 'there are no disputed factual questions as to matters outside the trial record.' " (*Ibid.*)

12

B.    *An Evidentiary Hearing Is Not Required Here*

"Under unusual circumstances . . . this court may decline to order a hearing and simply decide the case." (*In re Hardy* (2007) 41 Cal.4th 977, 990.)  Here, the return expressly admits crucial allegations which justify vacating the sexual assault convictions along with the attendant special circumstances and judgment of death.  Respondent acknowledges that, with vacation of the sexual assault convictions, "the factual premise for felony-murder has been discredited."  He argues, however, that petitioner's conviction should be *reduced* from first degree murder.

Because respondent concedes that false evidence was admitted at trial, there are " 'no disputed factual questions as to matters outside the trial record.' " (*Duvall*, *supra*, 9 Cal.4th at p. 478, quoting *People v. Karis* (1988) 46 Cal.3d 612, 656; see also *People v. Romero* (1994) 8 Cal.4th 728, 739.)  Respondent does not concede that trial counsel was deficient.  Because the concessions he does make support relief, we need not order a hearing on this disputed topic.  (*Duvall*, at p. 477.)

C.    *Respondent Concedes Petitioner Is Entitled to Relief*

1.    *False Evidence Was Introduced at Petitioner's Trial*

"A writ of habeas corpus may be prosecuted" where "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to his or her incarceration." (§ 1473, subd. (b)(1).)  False evidence includes opinions that have either been repudiated by the expert who originally gave them or "that have been undermined by later scientific research or technological advances." (§ 1473, subd. (e)(1).)  We recently explained "[t]he plain meaning of [subdivision (e)(1)] makes clear that an expert opinion given at trial can later be deemed 'false evidence' . . . if the expert repudiates his or [her] own opinion given at trial." (*In re Richards* (2016) 63 Cal.4th 291, 309 (*Richards II*).)

Respondent concedes that Dr. Diamond's repudiation of his trial testimony is alone sufficient to establish petitioner's entitlement to relief.  Additionally, a number of

13

other medical professionals have recanted their testimony or clarified that they no longer believe that Consuelo was sexually assaulted. Still others have declared that the purported cause of death was "anatomically impossible." The concession and repudiations lead overwhelmingly to the conclusion that false evidence was introduced at petitioner's trial.

2. *Because It Is Reasonably Probable That the Outcome of Petitioner's Trial Would Have Been Different Without the False Evidence, Habeas Relief Is Warranted*

Determining that the evidence was false clears the first hurdle to relief. "The statute and the prior decisions applying section 1473 make clear that once a defendant shows that false evidence was admitted at trial, relief is available under section 1473 as long as the false evidence was 'material.' " (*Richards II*, *supra*, 63 Cal.4th at p. 312.) Materiality is shown if there is a reasonable probability the result would have been different without the false evidence. (*Ibid*.) That is the case here.

Respondent agrees false evidence tainted many of the jury's guilt findings and death sentence, yet contends the murder conviction should not be reversed. He urges it is reasonably probable the jury would have convicted him of second degree murder in light of Consuelo's catastrophic injuries. The parties agree that second degree murder is a lesser included offense of first degree murder. (See *People v. Taylor* (2010) 48 Cal.4th 574, 623.) Petitioner argues, however, that this general rule applies only to malice and implied malice murder. Because first degree malice murder is not a lesser included offense of felony murder, he urges, second degree implied malice murder cannot be a lesser included offense of first degree felony murder. We need not resolve this dispute to conclude that reducing petitioner's conviction to second degree murder is not warranted here.

Respondent relies on *In re Bower* (1985) 38 Cal.3d 865 to argue a reduction to second degree murder is warranted. *Bower* was initially tried for second degree murder

14

after a stipulation limited his potential liability to that crime. (*Id.* at p. 870.) The first trial resulted in a mistrial. The prosecution then decided to charge the petitioner with first degree murder, declining to honor its earlier stipulation. (*Id.* at p. 871.) No new evidence was presented at the second trial; the prosecutor simply changed his theory of the case. (*Id.* at pp. 879-880.) We concluded that this change in tactics gave rise to an unrebuttable presumption of vindictiveness and modified the judgment to second degree murder. (*Id.* at p. 880.) In so doing, we noted the court's power to dispose of a habeas petition is analogous to an appellate court's power to modify a judgment to reduce the degree of a crime under section 1260.**9** (*In re Bower*, at p. 880.) Relying on this language, respondent argues that this court has the power to reduce petitioner's sentence rather than order a new trial. Respondent also points out that we have occasionally reduced a sentence on direct appeal. (See *People v. Steger* (1976) 16 Cal.3d 539, 553.)

Here, the jury was instructed on felony murder as well as first and second degree malice murder. The appellate opinion observed: "[T]he jury found true three special circumstance allegations, namely that [petitioner] killed Consuelo during the commission of the felony offenses of rape, sodomy, and lewd conduct on a child under the age of 14. Given these findings, the jury necessarily determined that the killing of Consuelo 'was first degree felony murder perpetrated in the commission of [those crimes] and not any lesser form of homicide.' [Citation]

"Further, contrary to [petitioner's] assertions, the jury was not left with an 'all or nothing' choice between capital murder and acquittal when the court refused to instruct on manslaughter. [Citation] The jury had the choice of finding [petitioner] guilty of

---

**9**      Section 1260 provides: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

15

second degree murder as instructed by the court." (*Benavides*, *supra*, 35 Cal.4th at p. 103.)

By asserting that the jury "would have" convicted petitioner of second degree murder, albeit after a much different trial with radically different evidence, respondent essentially asks this court to reform that aspect of the verdict. The argument is unpersuasive.

Stripped of falsity, the evidence would show that Consuelo suffered profound injuries while in petitioner's care. Petitioner gave a statement to police describing the afternoon's events and he testified similarly at trial. Petitioner maintained that after the child briefly evaded his supervision, he found her outdoors, vomiting and quite ill. Petitioner presented expert testimony that the child could have been injured in an automobile accident. Prosecution witnesses agreed that the type of injuries Consuelo sustained, including pupil dilation and compression rib fractures, are commonly seen in automobile accidents. Even if the injuries were inflicted at the hands of another, a defense expert testified that multiple types of forceful blows would have been required to explain the different injuries Consuelo suffered. Indeed, the injuries suggest the assailant would have been "in a rage," although there was evidence that, moments before, petitioner had been calmly fixing a dinner, the makings of which remained in the apartment days later. It is an impossible task to speculate whether the jury would have been persuaded that petitioner was guilty of second degree murder without the false evidence.

Clearly, Consuelo had been seriously injured in the weeks before this incident. She suffered a broken arm two months before her death. Her ribs were fractured at least three to four weeks before her demise. Additionally, dense scars between her colon and liver indicate Consuelo suffered trauma at least a month before her hospitalization. Consuelo had a fever and was crying in pain on the Halloween night several weeks before her passing. She had been vomiting sporadically for weeks before that evening.

16

Petitioner insisted he had not cared for the children alone in the months preceding her death. Consuelo's mother testified that petitioner did not live at her home and only stayed there on her days off. There was some evidence bearing on petitioner's access to Consuelo but it was fairly tangential and itself vulnerable to attack.[10] The extent to which Consuelo's earlier injuries would have influenced the jury's views of petitioner's culpability for second degree murder is difficult to gauge.

To be sure petitioner's own trial testimony was strenuously challenged. But here we have a first degree murder conviction based on a felony murder theory. The evidence now shown to be false was extensive, pervasive, and impactful. What the jury might have concluded in its absence is an exercise in speculation. For example, the prosecutor argued in closing that Consuelo died either as a result of sodomy alone, or from sodomy, rape, and assault. The jury was expressly invited to conclude that the child was killed by petitioner's sexual assault. That argument was tainted by the false evidence. In that light, the jury had scant need to consider other theories, and no ability to do so outside the pall cast by the completely repudiated testimony.

The jury may have convicted petitioner under a malice murder theory. There is extensive evidence that Consuelo suffered profound injury while in his care. But, in the absence of sexual assault, how those injuries might have been caused, and any motive for their infliction, is less than clear. The jury heard some evidence suggesting Consuelo could have been struck by a car. But much of that testimony was challenged by the false evidence. Defense experts were unable to explain how Consuelo could have suffered

---

**10** Without defense objection, Consuelo's mother was permitted to testify that six months after Consuelo's death, her nine-year-old daughter said, "[S]ometime before September 24, 1991" (*Benavides*, *supra*, 35 Cal.4th at p. 91), petitioner, alone, cared for the girls, and he kept Consuelo in his bedroom overnight. Although the sister testified at trial, she was not asked about that occasion on either direct or cross examination. The hearsay aspect of the mother's testimony and the post hoc nature of the reporting raise several issues as to the admissibility of the evidence and the weight a jury might give it.

17

both abdominal and genital injuries, all during the short time during which petitioner was alone with the child. The jury had no opportunity to evaluate the likelihood of such an accident divorced from the specter of the false evidence.

Further, jurors could have harbored concerns about petitioner's culpability in light of evidence that Consuelo had sustained serious injuries in the weeks before her hospitalization. They may have questioned petitioner's opportunity to inflict those injuries in light of evidence that petitioner had no unobserved access to the children between May and November 1991. But the import of those earlier injuries was overshadowed by the pervasive false evidence of sexual assault.

At the end of the day, respondent is not asking us to uphold a verdict that would properly have been reached even in the face of evidentiary error. Instead he is asking that we substitute a different verdict that the jury could have rendered in the absence of pervasive and inflammatory false testimony. The question is not whether we have the authority to reduce the conviction. We do. Nor do we suggest that we may never reform a verdict in a case of false evidence. We may. The issue is whether we should do so in this particular case. As we noted in *Richards II*, the "required showing of prejudice [for false evidence] is the same as the reasonably probable test for state law error established under *People v. Watson* (1956) 46 Cal.2d 818, 836.)" (*Richards II*, *supra*, 63 Cal.4th at pp. 312-313.) Nothing we say here calls that standard into question.

Respondent and petitioner engage in much point and counterpoint as to what a body of expurgated evidence might show and what verdict a jury that received such evidence might return. We decline to posit a radically different trial than the one petitioner received, then try and discern what a jury might have concluded had untainted evidence, argued under a different legal theory, been presented. Nor would it be productive to order an evidentiary hearing on this question. A referee would be in no stronger position than we to divine what a jury might have determined. Whether the

18

inquiry is conducted here or before a referee, the level of speculation required cautions against modification of this verdict.

## V.    DISPOSITION

The petition for writ of habeas corpus is granted.  The judgment of conviction in *People v. Vicente Figueroa Benavides*, (Super. Ct. Kern County, 1993, No. 48266), is vacated in its entirety.  The matter is remanded to the Kern County Superior Court.  Upon finality of our opinion, the Clerk of the Supreme Court is to remit a certified copy of the opinion and order to the trial court for filing.  Respondent is directed to serve a copy of the opinion on the prosecuting attorney.  (See § 1382, subd. (a)(2); see also *In re Sixto* (1989) 48 Cal.3d 1247, 1265; *In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9.)

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**SIMONS, J.***

---

*    Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Figueroa

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S111336
**Date Filed:** March 12, 2018

_____

**Court:** Superior
**County:** Kern
**Judge:** James M. Stuart

_____

**Counsel:**

Michael Laurence, Cristina Bordé, Melissa R. Hooper, Michael J. Hersek, Miro F. Cizin, Monica Othón Espinosa and Paula Fog for Petitioner Vincente Benavides Figueroa.

Bill Lockyer, Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Robert R. Anderson, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Jo Graves, Michael P. Farrell and Ronald S. Matthias, Assistant Attorneys General, Ward A. Campbell, Carlos A. Martinez, Eric L. Christoffersen, Kenneth N. Sokoler, Sean M. McCoy, Ryan B McCarroll, Chung Mi (Alexa) Choi and Kelly E. LeBel, Deputy Attorneys General, for Respondent California Department of Corrections and Rehabilitation.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paula Fog
Habeas Corpus Resource Center
303 Second Street, Suite 400 South
San Francisco, CA  94107
(415) 348-3800

Kenneth N. Sokoler
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 327-3572