Filed 8/30/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re JACK EDWARD SAGIN,<br><br>      on Habeas Corpus. | H044767<br>(Monterey County<br> Super. Ct. No. MCR 5971, HC7683) |

Jack Sagin has been in prison for over 30 years. Sentenced to life without parole after being convicted of murder in 1986, he has petitioned for a writ of habeas corpus, asserting that newly available DNA evidence shows he was not at the scene of the crime. As we will explain, we find it more likely than not the new evidence would have changed the outcome of Sagin's trial. We will therefore grant the requested relief by vacating the conviction.

## I. BACKGROUND

### THE MURDER (1985)

"Victim of Stabbing Found Dead in Home," read the headline in the July 16, 1985 edition of the *Monterey Peninsula Herald*. The paper reported that 40-year-old Paula Durocher was discovered in her Monterey apartment around 11:00 the previous morning, dead of multiple stab wounds to the upper body: "Durocher, who apparently was divorced and lived alone, was found by her daughter. … No arrests have been made in the case and there are no suspects."

The summer ended without the killer being identified. After more than two months, police had not made an arrest. But in early October, two inmates at the Monterey County Jail separately reported that Jack Sagin (also housed at the jail awaiting trial on other charges) confessed to killing Paula Durocher. Both inmates had significant criminal records and were known informants who had in the past provided tips to police

in exchange for leniency in their own cases.  Authorities deemed the information reliable, and Sagin was charged with first degree murder.

### THE TRIAL (1986)

Sagin pleaded not guilty and the case went to trial in July 1986, one year after Ms. Durocher's death.  "The defense in this case is simple and straightforward," Sagin's attorney told the jury in an opening statement.  "Mr. Sagin did not kill this lady, Paula Durocher.  He had nothing to do with her death.  He was not in the city of Monterey during the weekend in which she died.  He was not in the County of Monterey in the weekend on which she died."

The first witness called by the prosecution was the medical examiner, who described the victim's injuries.  She had been stabbed five times with a thin blade, similar to a kitchen knife.  There was a superficial stab wound to her head; one wound to the jugular vein in her neck; and three wounds that pierced her heart and were the likely cause of death.  The victim also had a lacerated ear, bruises on her lip, and an abrasion on her cheek.  The abrasion was probably from being smothered by a couch cushion. Examination of the lungs, which showed signs of suffocation, supported that conclusion. The victim's hands showed bruising to her thumbs, suggesting holding something very strongly or squeezing, and a cut near the second knuckle of the left hand.  The precise time of death could not be determined, but the victim had likely been killed between 18 and 40 hours before her body was discovered on Monday morning.

The prosecution called several witnesses to corroborate that timeframe. Ms. Durocher's son had telephoned her between 10:30 and 11:00 on Saturday morning. She answered and said she would call back because she was taking a shower.  The last person known to have seen Ms. Durocher alive was a male coworker who visited her around 10:30 the same morning and stayed for half an hour.  Then the man she was dating telephoned her at 4:00 Saturday afternoon, and again at 6:00.  He got no answer either time.  Ms. Durocher's body was found by her daughter the following Monday

2

morning, after she received a call that her mother had not arrived at work and went to check on her. The daughter found the front door of the apartment locked but the sliding patio door ajar. She saw her mother's body on the living room floor, face up, dressed in a bathrobe with a towel draped across the feet. The apartment did not seem ransacked and nothing was missing except for a kitchen knife (the likely murder weapon). On cross-examination the daughter was asked about several of her mother's ex-boyfriends, including one she characterized as jealous and another who had been violent.

Russel Wydler testified to connect Sagin to the victim. Wydler was a former boyfriend of Ms. Durocher who once lived with her; he habitually asked her for money, which she usually provided. Wydler said he met Sagin hanging around Fisherman's Wharf and he once took him along on a visit to Ms. Durocher's house to borrow $40. Wydler knew she often left her back door open. "Did you tell Sagin that?" the prosecutor inquired. "Yes, I might have, you know, brought it up, or something," Wydler answered. On cross-examination, though, Wydler was impeached by his previous testimony: At the preliminary hearing, he said he had never taken Sagin to Paula Durocher's apartment. He explained that he had been untruthful at the preliminary hearing because he was afraid of retribution from Sagin.

The prosecution then called the two informants from the jail: Louis Graxiola and Robert Castenada. Graxiola occupied the cell next to Sagin after being arrested for theft. In October 1985, Sagin began talking about a murder—he said a woman was killed in Monterey, and he knew something about it. Graxiola had given police information about a murder case in the past and admitted that after talking to Sagin, "it probably crossed [his] mind" that telling police about this murder would be a way to get himself out of jail. According to Graxiola, Sagin said police were trying to pin the crime on him using a footprint found at the scene. Sagin knew that the victim had been stabbed three or four times in the heart. Sagin also said he had previously been to her house with a man named Russel, who was the victim's boyfriend. The next day Graxiola pressed for more

3

information.  Though Sagin never admitted killing anyone, he said there had been an altercation—"the woman caught him in the house and she wasn't supposed to be there, and they kind of fought."  He said the woman "took a swing at him and he told her he would kill her, you motherfucker."

Robert Castenada was also housed in a cell next to Sagin in October 1985.  Castenada had been convicted of at least 13 felonies.  Like Graxiola, he had previously been an informant for police.  According to Castenada, Sagin gave him a more detailed confession.  Sagin first said someone was trying to frame him and Russel for the murder.  Then—after Castenada purportedly gave him a prescription muscle relaxant—Sagin admitted to killing Ms. Durocher alone; that he went in to do a burglary "and she popped out of nowhere and he stabbed her three times in the heart."  Castenada recalled Sagin saying he did not leave with anything, "he just panicked and took off."  In exchange for Castenada providing this information, two police officers appeared at a parole revocation hearing to recommend an earlier release date for him, which the parole board granted.

The prosecution called several witnesses whose testimony put Sagin in the Monterey area at the time of the murder.  A woman who lived at a motel in Seaside and an acquaintance who was staying with her both testified Sagin was there the entire weekend.  It was stipulated that the weekend after the murder, the woman traveled with Sagin to Tracy, California.[1]  She remembered visiting Sagin's mother in San Jose on that trip.  The prosecution also called the woman's 13-year-old daughter (age 12 at the time of the events), who recalled Sagin staying at the motel in Seaside.  The girl described Sagin coming home drunk one night during the weekend Durocher was killed, sitting on the couch and mumbling to himself: "He goes, 'Well, I hit her,' and then he starts to fall

---

[1] The defense stipulated to this fact to avoid the jury hearing testimony from the woman that she remembered being with Sagin in Tracy that weekend because they were committing burglaries there.

4

asleep.  And then he would wake up, and then he would say, 'She's hurt bad.'  And then he'd fall asleep, and then he would just—repeat."

The defense case focused on establishing Sagin's alibi:  that he was in San Jose visiting his mother when the murder happened.  Sagin's mother testified he was at her home in San Jose the entire weekend.  She was sure it was that weekend because her daughter had a baby earlier that week.  Sagin's sister testified that she, too, was certain he had been at their mother's home on those dates.  Her husband also remembered seeing Sagin in San Jose beginning "the Friday after the baby was born."  Sagin stayed there through the weekend, sleeping on the floor because the home was crowded with the new baby and other family members.  All three witnesses were effectively cross-examined, however, as none of them had previously come forward to authorities with the alibi information despite knowing Sagin had been charged with committing a murder in Monterey that weekend.

Just before the close of evidence, defense counsel notified the court about another significant witness:  "Your Honor, I've got a witness who I learned about last night who was present at the Sagin house when Jack was there.  She was there for about two hours on Saturday morning.  I talked to her and she was going to drive down here from San Jose.  She's not here yet.  [¶] … [¶]  I had her come down here and I had hoped to have her testify, but she's not here now."  Counsel said he expected the witness to arrive by 4:00 p.m. that afternoon, so the court agreed to a brief recess.  The witness, a friend of Sagin's sister, arrived.  She confirmed she saw Sagin on the Saturday in question:  "Q: How long were you [at Sagin's mother's house]? [¶] A:  About two and a half hours. [¶] Q:  What time of day? [¶] A:  Around—between eight and eight-thirty till probably around ten or so, ten-thirty. [¶]  Q:  Did you see Jack Sagin there? [¶] A:  Yes, I did.  [¶] Q:  This man here (indicating)? [¶]  A:  Yes."

In closing argument, the prosecutor acknowledged there was conflicting evidence and that to resolve the case the jury had to decide which witnesses to believe:  "If you

5

believe the evidence presented by the People's witnesses and the People's case, this man is guilty. He's guilty as hell. If you believe the defense evidence, he wasn't even in Monterey County when this happened." The jury returned a verdict finding Sagin guilty of first degree murder (Pen. Code, § 187), committed while engaged in a residential burglary (Pen. Code, § 190.2, subd. (a)(17)). It also found him guilty of burglary (Pen. Code, § 459). On October 9, 1986, Sagin was sentenced to life in prison without the possibility of parole.

### DIRECT APPEAL (1988)

Sagin appealed. He contended the trial court erred by admitting evidence of his previous incarceration and that the prosecutor committed misconduct through improper closing argument. In affirming the judgment, this court found no legal error but noted the closeness of the case, observing, "the evidence here was conflicting and derived from testimony by vulnerable witnesses on both sides, where small factors might have tipped the scales … ." (*People v. Sagin* (June 28, 1988, H002468), nonpub.opn., p. 19.)

### DNA TESTING (2009)

More than 20 years after trial, the Northern California Innocence Project, representing Sagin, identified evidence retained by the Monterey Police Department that could be tested for DNA, and moved for an order allowing that testing. (See Pen. Code, § 1405.) The motion sought testing on the following items: vaginal swabs taken from the victim; the bathrobe she wore at the time of her death; the towels draped on her lower body; hairs found on a couch cushion and on her back; the couch cushion cover; a marijuana cigarette; a broken necklace and earring; and scrapings taken from underneath the victim's fingernails. The superior court granted the motion and ordered the DNA testing.

### DNA RESULTS (2010)

Initial results of the DNA testing were available in Spring 2010 and results from additional testing followed. DNA was found on the bathrobe, the two towels, the vaginal

swabs, the hair from the couch cushion, and the scrapings from underneath the fingernails on the victim's left hand. None of it matches Jack Sagin.

The bathrobe contained DNA from sperm from both the man Ms. Durocher was dating at the time and from an ex-boyfriend. The vaginal swabs had DNA from the man she was dating. The hair found on the couch cushion was the ex-boyfriend's. The towels contained DNA from the coworker who visited Ms. Durocher shortly before her death, as well as from the ex-boyfriend. But the scrapings from underneath Ms. Durocher's fingernails contained DNA from an unknown male.

### *HABEAS CORPUS PETITIONS (2012-2019)*

In March 2012, Sagin petitioned the superior court for a writ of habeas corpus based on the newly discovered DNA evidence. The petition was summarily denied, and Sagin then petitioned this court. We ordered the California Department of Corrections and Rehabilitation to show cause in the superior court why Sagin was not entitled to relief. The superior court denied the petition on the briefing without holding an evidentiary hearing.

Sagin again petitioned this court for a writ of habeas corpus in October 2015. We issued another order to show cause in the superior court. This time, we ordered that the court hold an evidentiary hearing to resolve disputed factual issues related to the DNA evidence.

The superior court conducted the evidentiary hearing in April 2017. A deputy coroner who processed the crime scene in 1985 testified and was asked about the injuries to the victim's hands. He noted that the hands displayed "quite traumatic" injuries that "certainly could have been defense wounds," of the type incurred when "an individual puts up their hands to defend themselves during an attack or blows."

Two DNA experts testified, one in support of the petition and one against. Sagin's expert described the methods used to test the evidence for DNA. For fabric evidence— the bathrobe and towels—the items were first examined for staining from bodily fluids

7

like blood or semen. Where a stain was found, a swatch was cut. A small piece (a centimeter or two square) was then taken from the swatch and tested for DNA. Material from the fingernail scrapings was also tested. The scrapings contained a moderate amount of DNA from an unidentified male contributor. The unknown male's DNA was run through a database of DNA profiles of laboratory staff to rule out accidental contamination during testing. And it was entered into the Combined Offender DNA Index System (CODIS) to determine if it matched any profile in that database of criminal offenders. It did not.

Sagin's expert said it was possible for the perpetrator of a murder to not leave DNA at the crime scene but that would be unlikely in a killing where a struggle occurred. In a close contact, violent attack, one would expect to find perpetrator DNA "most of the time."

The state's expert also thought it possible for the perpetrator of a crime to avoid leaving DNA, though the "more violent the crime gets, the harder it is to not leave anything behind." He testified he could not rule out the possibility of contamination of the sample as an explanation for the DNA under the victim's fingernails, but "at the same time, [he] can't argue strongly for it." He also explained that fingernail scrapings from the victim are tested in violent crime cases because "if there was a struggle, there may be DNA from the perpetrator under the person's fingernails." The parties stipulated to the DNA testing results showing Jack Sagin's DNA was not present on any item tested.

The superior court denied Sagin's petition by written order in May 2017. Sagin once again sought relief from this court, filing a new petition for habeas corpus in June 2017. (A petitioner whose habeas petition is denied by the superior court has no right to appeal that decision; the recourse is to file a new petition in the reviewing court. (*People v. Gallardo* (2000) 77 Cal.App.4th 971, 983.)) We issued an order to show cause why Sagin is not entitled to relief on his claim of newly discovered evidence. We now address the merits of that claim.

## II.    DISCUSSION

The writ of habeas corpus is the " 'highest safeguard of liberty.' " (*People v. Villa* (2009) 45 Cal.4th 1063, 1068, quoting *Smith v. Bennett* (1961) 365 U.S. 708, 712.)  Its purpose is to determine whether a person imprisoned by the state is being legally held and to provide summary relief if the imprisonment is unlawful.  (*People v. Romero* (1994) 8 Cal.4th 728, 736–737.)  "Despite the substantive and procedural protections afforded those accused of committing crimes, the basic charters governing our society wisely hold open a final possibility for prisoners to prove their convictions were obtained unjustly."  (*In re Sanders* (1999) 21 Cal.4th 697, 703.)  When a defendant has been wrongly convicted, a writ of habeas corpus serves to vacate the judgment of conviction and restore the defendant "to the position she or he would be in if there had been no trial and conviction."  (*In re Cruz* (2003) 104 Cal.App.4th 1339, 1346.)  Having issued an order to show cause returnable in this court, we have original jurisdiction in this habeas proceeding.  (*In re Kler* (2010) 188 Cal.App.4th 1399, 1403.)  We are not reviewing the superior court's decision on the previous petition and owe it no deference; rather, we exercise our independent judgment to decide whether relief is warranted.

### A.  AMENDED STANDARD FOR HABEAS RELIEF BASED ON NEW EVIDENCE

Penal Code section 1473, subdivision (b)(3)(A) provides that a writ of habeas corpus should issue when "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial."  New evidence is defined as "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching."  (Pen. Code, § 1473, subd. (b)(3)(B).)

The parties agree the DNA evidence could not have been discovered before trial (as the technology to do the testing did not exist until well afterward), and there is no

9

dispute regarding admissibility. There is also no dispute about a key fact: the results of the DNA testing. The parties have stipulated that none of the DNA tested matches Sagin, and that the DNA under the victim's fingernails is from an unknown male. With no factual dispute on those points, the issue before us becomes a question of law. We must decide whether the DNA evidence "would have more likely than not changed the outcome at trial." (Pen. Code, § 1473, subd. (b)(3)(A).)

A changed trial outcome means a result different from the guilty verdict Sagin's jury returned. Significantly, that definition does not require an acquittal, but also encompasses a hung jury. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.) "More likely than not" means just that—it is unnecessary to survey authorities or attempt to differently define that concept; it is already stated the most understandable way. Sagin's burden in this habeas proceeding is to show it is more likely than not the new DNA evidence would have led at least one juror to maintain a reasonable doubt of guilt.

We note that the bar used to be considerably higher for a petition of this nature. Before the Legislature amended Penal Code section 1473 in 2016 to provide for habeas relief when new evidence more likely than not would have changed the trial outcome, a habeas petitioner proceeding on this ground had to show the new evidence pointed " 'unerringly to innocence' " and "undermine[d] the entire case of the prosecution." (*In re Hall* (1981) 30 Cal.3d 408, 423.) That former standard required a petitioner to conclusively establish innocence. (*Ibid.*) Habeas relief was thus previously reserved for those cases where newly discovered evidence essentially on its own proved a petitioner did not commit the crime. The amendment to Penal Code section 1473 changed that. A petitioner no longer has to prove innocence but rather must show that the new evidence— viewed in relation to the evidence actually presented at trial[2]—would raise a reasonable

---

[2] Since the standard requires that we engage in the retrospective analysis of deciding whether the new evidence would have changed the trial outcome, we consider only the new evidence identified by the petitioner and the trial record. We do not

(*continued*)

10

doubt as to guilt. The statute creates a sliding scale: in a case where the evidence of guilt presented at trial was overwhelming, only the most compelling new evidence will provide a basis for habeas relief; on the other hand, if the trial was close, the new evidence need not point so conclusively to innocence to tip the scales in favor of the petitioner. The change in the law represents an overall lower tolerance for wrongful convictions. The Legislature has chosen to more closely protect society's interest in ensuring that a person convicted of a crime is the person who committed it.

## B. THE DNA EVIDENCE MORE LIKELY THAN NOT WOULD HAVE CHANGED THE TRIAL OUTCOME

As we have discussed, the relative strength required of new evidence depends on how close the trial was. We begin by again noting the assessment this court made in 1988 when reviewing the case on appeal: The evidence was conflicting. The credibility of the key witnesses on both sides was vulnerable. And "small factors might have tipped the scales." (*People v. Sagin* (June 28, 1988, H002468) nonpub. opn., p. 19.) The Attorney General characterizes the trial differently, emphasizing the three witnesses (two informants and the teenage girl from the motel) who testified to incriminating statements purportedly made by Sagin. In the Attorney General's view, the two informants must be deemed credible because they knew things about the crime not made public—specifically, that the victim had a relationship with a man named Russel, and that she had been stabbed in the heart. We agree that those details bolster the credibility of the testimony. Indeed, without those specifics it is hard to imagine a jury accepting that Sagin spontaneously confessed to murder, twice, both times in jail to known informants

---

consider other evidence outside the record. The Attorney General has included as exhibits to the return to order to show cause police reports from burglaries which Sagin admitted committing, and urges such evidence would be admissible "[i]f petitioner were to be retried." But that misapprehends the nature of our inquiry. Our task is to determine whether the new evidence proffered by Sagin entitles him to a new trial, not to predict the outcome of a future trial or to determine the ultimate issue of culpability. (See *In re Figueroa* (2018) 4 Cal.5th 576, 592.)

11

who stood to benefit from turning him in. But while lending the testimony needed credibility, the details are not the sort that could be known only to the perpetrator. Russel Wydler's relationship with the victim is information that would have been known by any number of people. It was known by the police officers investigating the case, who could have revealed it to the informants, even unintentionally (although they testified otherwise). The Attorney General tells us that police first learned about Wydler when they heard his name from the informants, but that is not accurate. Police knew about Wydler and his connection to the victim within days of the murder, and interviewed him. As for the location of the stab wounds, Graxiola testified that Sagin said the victim "was stabbed three or four times in the heart," and Castenada said "he stabbed her three times in the heart." Of course, it had been reported in the newspaper that the victim had "multiple stab wounds to the upper body." Again, the location of the wounds was something police knew about when they spoke with the informants. And what the informants relayed about the wounds is incomplete. The actual killer would have known he stabbed the victim in the head and inflicted a potentially fatal wound to the neck, in addition to the chest wounds.

The Attorney General also relies on the testimony of the 13-year-old girl who lived in the motel unit where Sagin was staying and overheard him drunkenly mumbling words to the effect of " 'I hit her' " … " '[s]he's hurt bad.' " But that testimony is somewhat vague, and even assuming its accuracy, the statements attributed to Sagin are susceptible of alternative explanations. The girl's testimony is evidence favorable to the prosecution, to be sure, but it does not convince us that the case for guilt was exceptionally strong.

Contradicting the prosecution's entire case are the four alibi witnesses who testified that Sagin was at his mother's house in San Jose when the murder occurred. Sagin's mother, sister, and brother-in-law each had an inherent familial bias and no clear explanation for why they had not come forward earlier. But the sister's friend—who

12

unequivocally testified she saw Sagin in San Jose—did not have the same level of bias. Nor was her testimony undermined by not coming forward earlier, as it was never established when she learned Sagin had been charged.

This case was close. In the end, there was no physical evidence linking Sagin to the crime. The jury therefore had to decide which witnesses to believe, as the prosecutor readily acknowledged in closing argument. Given that context, the ultimate question is whether the addition of the DNA evidence to Sagin's trial would have produced a reasonable doubt in the mind of at least one juror. We believe it would have. In arriving at that decision, it is important to be clear about what the new evidence shows—and what it does not. The DNA evidence does not prove Sagin was not present at the crime scene. It proves only that Sagin's DNA was not on the items tested. And those items were necessarily few—it is not as though the entire crime scene was available for testing decades after the killing. The DNA experts testified it would be unlikely for the perpetrator of a close contact homicide not to leave DNA behind, but that point is limited because again, we know only that Sagin's DNA was not on the items tested, not that it was nowhere at the scene. It is not significant that Sagin's DNA was not on the vaginal swab from the victim. It is also unremarkable that his DNA was not found on tiny squares of fabric from the robe and towels, the tested areas having been selected because they appeared to be stained with bodily fluid. That Sagin did not leave DNA on those areas and did not stain the fabric with bodily fluids supports the defense theory he was not at the victim's apartment, but not conclusively.

The more than trace amount of DNA from an unknown male underneath the victim's fingernails, however, is different. That is powerful evidence the victim was killed by someone other than Jack Sagin. It indicates that shortly before she died, Ms. Durocher had close contact with a man whose identity is still not known. There is no factually supported explanation for how the DNA got there if it is not from the perpetrator (unlike the more expected presence of DNA from Ms. Durocher's boyfriend,

13

ex-boyfriend, and coworker). And it is very likely that Ms. Durocher's hands came into contact with her killer—there was an extended struggle, long enough for her to sustain multiple facial injuries and to be smothered with a couch cushion and stabbed five times. She also had defensive wounds on her hands, including some suggesting that she held or squeezed something very strongly.

The DNA under the victim's fingernails does not, standing alone, prove someone other than Sagin committed the crime. Under the former standard requiring that new evidence point unerringly to innocence, he would not be entitled to relief. But under the revised standard—requiring only that the new evidence would likely have changed the trial outcome—he is. The jury would have considered the DNA results in the context of the rest of the evidence, including the testimony of four alibi witnesses that, if credited, establishes Sagin is not the perpetrator. Learning that there was DNA from an unidentified male under the fingernails of a victim whose hands almost certainly came into contact with her assailant, together with no DNA results matching Sagin, would have caused the jury to view more favorably the testimony of the witnesses who swore Sagin was nowhere near the crime scene. Under those circumstances, it is more likely than not that at least one juror would have maintained a reasonable doubt regarding guilt. The standard of Penal Code section 1473, subdivision (b)(3) has been satisfied. Sagin is entitled to relief.

### III.   DISPOSITION

The judgment of the Monterey County Superior Court in *People v. Jack Edward Sagin*, case No. MCR 5971 is vacated. The District Attorney may elect within the time allowed by law to conduct a retrial. Unless there is a timely election to retry Sagin, he is ordered released.

14

_____

Grover, J.

**WE CONCUR:**

_____

Elia, Acting P. J.

_____

Mihara, J.

**H044767 -** *In re Jack Edward Sagin on Habeas Corpus*

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Case No.: MCR 5971, HC7683 |
| Trial Judge: | Hon. Julie R. Culver |
| Attorneys for Respondent:<br>The People | Xavier Becerra<br>  Attorney General of California<br>Gerald A. Engler<br>  Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>  Senior Assistant Attorney General<br>Laurence K. Sullivan<br>  Supervisiong Deputy Attorney General<br>Catherine A. Rivlin<br>  Supervising Deputy Attorney General |
| Attorneys for Petitioner:<br>Jack Edward Sagin | Emily V. Griffen<br>John A. Nathanson (*pro hac vice*)<br>Donna Zamora-Stevens<br>Lisa Valenti-Jordan<br>Shearman & Sterling LLP<br><br>Linda Starr<br>Melissa O'Connell<br>Kelley Fleming<br>Northern California Innocence Project at<br>Santa Clara University School of Law |
| Attorneys for Amici Curiae:<br>The California Innocence Project;<br>The Loyola Law School Project for<br>the Innocent; After Innocence; and<br>The Innocence Network | Kyle C. Wong<br>Max Alderman<br>Reece W. Trevor<br>Maureen Alger<br>Adam Gershenson (*pro hac vice*)<br>Cooley LLP |