# IN THE SUPREME COURT OF CALIFORNIA

In re DAVID KEITH ROGERS

on Habeas Corpus.

S084292

Kern County Superior Court

33477

July 15, 2019

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger and Groban concurred.

IN RE ROGERS

S084292

Opinion of the Court by Cantil-Sakauye, C. J.

Petitioner David Keith Rogers filed an original habeas corpus petition in this court contending he should be granted relief from his sentence of death. We issued an order to show cause with respect to various claims relating to petitioner's assertion that, at the penalty phase, prosecution witness Tambri Butler falsely identified petitioner as the man who sexually assaulted her. After an evidentiary hearing, our referee found that Butler had testified falsely when she identified petitioner as her assailant. As will appear, we generally accept the referee's findings, and therefore grant petitioner relief on the basis of false evidence by overturning his sentence of death. We therefore need not reach his claims of newly discovered evidence and ineffective assistance of counsel, the two other topics concerning which the referee made findings supportive of petitioner's claims.

## I. PROCEDURAL BACKGROUND

In 1988, a jury convicted petitioner of the first degree murder of Tracie Clark and the second degree murder of Janine Benintende (Pen. Code, §§ 187, 189)[1] and found true, among other things, the special circumstance allegation of multiple

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

murder (§ 190.2, subd. (a)(3)). At the penalty phase of the trial, the jury returned a verdict of death for the Clark murder. We unanimously affirmed petitioner's guilt verdict and death sentence. (*People v. Rogers* (2006) 39 Cal.4th 826 (*Rogers*).)

Petitioner filed a habeas corpus petition in 1999. In claims III through VI, he alleged that penalty phase witness Tambri Butler had misidentified him as the man who assaulted and raped her. Petitioner claimed that newly discovered evidence showed that an individual named Michael Ratzlaff was the assailant. Petitioner also included a declaration by Butler in which she expressed varying degrees of doubt about her identification of petitioner as her assailant, saying, in the first paragraph of the declaration, "I now believe my identification of Rogers was wrong" and, in the last paragraph, "I am now more concerned than ever that I wrongly identified David Rogers as the man who attacked me."

In 2007, we issued to the Secretary of the Department of Corrections and Rehabilitation an order to show cause why we should not grant petitioner relief on the grounds connected to the alleged misidentification by Tambri Butler, namely:

(1) newly discovered evidence and use of false evidence, as alleged in claim III;

(2) the prosecutor's failure to disclose exculpatory evidence, as alleged in claim IV;

(3) ineffective assistance of counsel, as alleged in subclaims (G), (K), (L), (M), (N), and (O) (to the extent petitioner alleged failure to request CALJIC No. 2.92) of claim V;

(4) cumulative penalty phase prejudice arising from the facts alleged in the subclaims of claim V identified in paragraph (3) above, as alleged in subclaim (Q) of claim V; and

2

(5) cumulative penalty phase prejudice arising from the facts alleged in the claims and subclaims identified in paragraphs (1) through (4) above, as alleged in claim VI.

After considering the Attorney General's return, filed in 2008, and petitioner's traverse, filed in 2009, we ordered a reference hearing. The order directed our referee to address, as relevant here, the following questions:

"1. Did Tambri Butler testify falsely (either inadvertently or otherwise) at the penalty phase of petitioner's trial regarding the identity of the person who assaulted her in January or February 1986?

"2. Did Tambri Butler testify falsely at the penalty phase of petitioner's trial regarding any other matter, including: (1) whether she had seen petitioner on television before she identified him as her attacker; and (2) whether she had been promised leniency for her testimony and/or was aware that she would be released early after she testified?

"3. Is there newly discovered, credible evidence indicating that petitioner did not assault Tambri Butler in 1986, including evidence that another person committed the assault? If so, what is that evidence?

"4. What information did law enforcement agencies involved in petitioner's prosecution possess before, during and after petitioner's trial regarding Michael Ratzlaff's attacks on prostitutes other than Tambri Butler? When did law enforcement come into possession of the information? Were the individual law enforcement officers who possessed the information involved in petitioner's prosecution? Was the prosecution in petitioner's case aware, or should it have been

aware, of the information? Did the prosecution disclose such information to petitioner's defense counsel?

"5. What crime was Tambri Butler serving time for at the time she testified at petitioner's trial? Did the prosecution disclose information about Tambri Butler's criminal history to the defense? If so, what information did it disclose?

"6. Was Tambri Butler promised leniency in exchange for her testimony against petitioner? Did Tambri Butler request early release in exchange for her testimony? Was Tambri Butler aware at the time she testified that she would be released early in exchange for her testimony? Was Tambri Butler threatened by law enforcement agents or given false information about the killing of Tracie Clark before she testified? Was the prosecution aware, or should it have been aware, of any promises or threats made to Tambri Butler or Butler's request or expectation of early release? If so, did it disclose such information to the defense?"[2]

---

[2] Our reference order included several additional questions on which the referee took evidence and made findings, but which we will not address in view of our disposition of questions 1 through 6. They are:

"7. What actions did petitioner's trial counsel, Eugene Lorenz, take to investigate the 1986 assault on Tambri Butler, including: (1) the identity of Butler's assailant; (2) whether Butler had seen petitioner on television before she identified him; (3) Butler's criminal history; and (4) whether petitioner had been involved in any prior arrests of Butler before she identified him as her assailant? What were the results of that investigation? Was that investigation conducted in a manner to be expected of a reasonably competent attorney acting as a diligent advocate? If not, in what respects was it inadequate?

"8.   If trial counsel's investigation was inadequate, what additional evidence would an adequate investigation have disclosed?  How credible was that evidence?  What investigative steps would have led to that additional evidence?

"9.   After conducting an adequate investigation of the assault on Butler, would a reasonably competent attorney acting as a diligent advocate have introduced additional evidence regarding: (1) the identity of Butler's assailant; (2) whether Butler had seen petitioner on television before she identified him; (3) Butler's criminal history; and (4) whether petitioner had been involved in any prior arrests of Butler before she identified him as her assailant?  What, if any, rebuttal evidence would have been available to the prosecution?

"10.   Did trial counsel have tactical or other reasons for failing to challenge the admissibility of Butler's testimony?  If so, what were those reasons?  After conducting an adequate investigation into the 1986 assault, would reasonably competent counsel have moved to exclude Butler's testimony?

"11.   Did trial counsel have tactical or other reasons for failing to impeach or rebut Tambri Butler's testimony?  If so, what was/were the reason(s)?  What impeaching or rebuttal evidence was available to counsel upon reasonable investigation?  Would a reasonably competent attorney acting as a diligent advocate have impeached or rebutted Butler's testimony?  If so, in what manner?

"12.   Did trial counsel have tactical or other reasons for failing to present expert testimony on eyewitness identifications?  If so, what was/were the reason(s)?  Would a reasonably competent attorney acting as a diligent advocate have presented expert testimony on eyewitness identifications?  What would such an expert witness have said?

"13.   Did trial counsel have tactical or other reasons for failing to request CALJIC No. 2.92?  If so, what was/were the reason(s)?  Would a reasonably competent attorney acting as a diligent advocate have requested CALJIC No. 2.92?

5

In 2009, we appointed the Honorable Louis P. Etcheverry, Judge of the Superior Court of Kern County, as our referee. In 2011, Judge Etcheverry conducted an evidentiary hearing, in which 27 witnesses, including Butler, testified. In 2015, the referee filed with us a 24-page report containing his findings. In 2016, petitioner and the Attorney General filed briefing and exceptions to the referee's report.

## II. TRIAL EVIDENCE

A detailed summary of the facts is set forth in *Rogers, supra,* 39 Cal.4th at pages 836 to 846. Briefly, the evidence at trial showed that petitioner, a Kern County sheriff's deputy, murdered 20-year-old Janine Benintende in early 1986 and 15-year-old Tracie Clark on February 8, 1987. Both women had been sex workers on Union Avenue in Bakersfield. Both bodies were found in the Arvin-Edison Canal. Both had been shot multiple times with bullets from a .38-caliber weapon. Bullets recovered from the women's bodies, tire tracks and shoe prints at the scene of the Clark murder, and an eyewitness account connected petitioner to the murders.

Benintende disappeared the day she arrived in Bakersfield in early 1986. Her badly decomposed body was later found floating in the Arvin-Edison canal. The body had been shot once near the sternum and twice in the back. Two bullets

---

"14. Did trial counsel have tactical or other reasons for failing to address Butler's testimony in closing argument at the penalty phase? If so, what was/were the reason(s)? Would a reasonably competent attorney acting as a diligent advocate have addressed Butler's testimony in closing argument at the penalty phase? If so, in what manner?"

were recovered from the body. Benintende's murder remained unsolved until after petitioner was arrested.

Clark was seen entering petitioner's pickup truck on Union Avenue during the early morning hours of February 8, 1987, by another sex worker who was familiar with petitioner. After Clark's body was found in the Arvin-Edison canal later that day, the witness identified petitioner's truck and selected his photo from a lineup. Bullets removed from Clark's body matched those recovered from Benintende's body and were the same type as sheriff's department-issued ammunition that was available to all deputies.

Petitioner was arrested a few days after the Clark murder. After waiving his rights to an attorney and to silence, he confessed to the Clark murder, but not the Benintende murder. Regarding the Clark murder, petitioner stated that while driving his pickup truck on Union Avenue early one morning he picked up Clark, agreed to pay her $30 for sex, and drove her out to the "country." Clark began performing fellatio on him, but then stopped and demanded more money because the liaison was taking so much of her time. When petitioner refused, an argument ensued; Clark hit, kicked, and yelled at him. He pointed a gun at her, hoping it would stop her from yelling and screaming, but it did not. The gun went off accidentally, wounding Clark. Petitioner began driving back to town but stopped when Clark continued to scream. He pushed her out of the truck. Clark ran around in front of the headlights yelling and screaming. Petitioner got out of the truck and tried to calm her, but when she continued yelling and threatened to report him he shot her a second time. Petitioner realized that if Clark reported him he would be arrested and go to jail. As Clark was leaning against an embankment, petitioner shot her four more

times, then dragged her body to the canal and pushed it into the water. When asked about the Benintende murder, petitioner at first denied shooting anyone other than Clark, but then said he could not remember.

A search of petitioner's home disclosed ammunition of the same type used in the killings and a .38-caliber handgun that was test-fired and determined to have fired the bullets that killed both victims. Petitioner's truck tires and shoes matched photos of tire tracks and shoe prints found at the murder scene.

A pathologist testified Clark died from multiple gunshot wounds. She had one gunshot entry wound on the right side of the ribcage, the bullet passing through her body and lodging on the left side of her torso; one entry wound to her back; and four wounds to the front of her torso.

Petitioner testified in his own defense and admitted killing Clark but claimed he did not form the intent required for the charged crimes due to a mental disturbance stemming from the sexual and physical abuse he had suffered as a child.

Three mental health professionals testified petitioner suffered from a dissociative disorder involving memory loss and a possible multiple personality disorder stemming from severe childhood sexual and physical abuse. A psychiatrist administered sodium amytal to petitioner and videotaped the resulting interview. When under the influence of the sodium amytal, petitioner remembered periods of his childhood that he had previously been unable to recall, as well as parts of the events leading to the Clark murder that he had blacked out.

Petitioner testified concerning the Clark killing, stating he could independently recall only what occurred up until the time he pushed Clark out of the truck. After that, his recollection

was based on his viewing of the videotape of the sodium amytal interview. The first part of his story was consistent with the account he gave police: he testified he picked Clark up on Union Avenue, agreed to pay her $30 for sex, and drove out to the country, where he parked, and Clark began performing oral sex. From that point, the two accounts diverged. Petitioner testified that during the encounter he had trouble having an erection, which caused Clark to taunt him about his sexuality and call him "queer" and "faggot," and he pushed her out of the truck. He recalled feeling threatened when she walked toward him pointing her finger, so he pointed his gun at her and shot her once. A few seconds later, he shot her five more times, to protect himself. He then dragged her body to the canal and pushed it into the water.

Based in part on his account of the killing in the sodium amytal interview, the three mental health professionals testified petitioner killed Clark while in an impulsive, highly emotional state and that he was incapable of premeditating or deliberating.

In rebuttal, the prosecution presented evidence that in 1983 petitioner had been terminated from his position as a deputy sheriff following a complaint by a sex worker, although he was ultimately reinstated.

The trial court granted petitioner's motion for partial acquittal on the Benintende count, reduced the charge to second degree murder, and instructed the jury it could reach no greater verdict than second degree murder on that count. As noted, the jury returned verdicts convicting petitioner of the first degree murder of Clark and the second degree murder of Benintende,

and found true a multiple-murder special-circumstance allegation.

At the penalty phase, Ellen M. (also known as Angel or Angela), the sex worker whose complaint had led to petitioner's brief termination in 1983, testified that after interrupting her liaison with a customer, petitioner detained her, told her to undress, and took photographs of her breasts and vaginal area.

Tambri Butler testified that petitioner assaulted her in February 1986, when she was a heroin addict engaging in sex work in Bakersfield. According to Butler, petitioner made contact with her on Union Avenue in a white pickup truck. He declined her request to go to her motel room, instead driving out to a field in the countryside. She agreed to perform "half and half," i.e., oral and vaginal intercourse, for $40. She took off her clothes and engaged him in conversation, "nothing important, just talking to the man finding out he wasn't a cop, a police officer," by asking "where he is from, if he has got a family," so that she would "feel comfortable for [her]self." After she performed oral sex they began to engage in vaginal sex. Because he had not ejaculated, and the encounter was taking a long time, she told him "he was either going to have to do something or he was going to have to give me some more money." He told her "no, that is not what was going to happen," "we were going to do some more things." When she "started getting sort of disagreeable," he took what she called a "stinger" gun off the dashboard and used it to shock her on the neck, which burned her and left scars. After further vaginal sex he demanded anal intercourse and, when she refused, he took an automatic weapon out of the glove compartment and fired it across the bridge of her nose. Thereafter she acceded to anal sex and again performed oral sex. Subsequently, he demanded she empty her

pockets, took her heroin and cash, and made her ask for them back. He then pushed her out of the truck and tried to run her over.

In mitigation, the videotape of petitioner's sodium amytal interview was played for the jury. One of petitioner's mental health experts reiterated his opinion that petitioner was under "extreme emotional distress" when he shot Clark, that the lifetime of abuse he had suffered made it difficult for him to conform his conduct to the law, and that he was an emotionally impaired person. Relatives and colleagues of petitioner testified regarding his positive qualities.

### III. THE REFEREE'S REPORT AND THE EVIDENTIARY HEARING

**Question 1. Did Tambri Butler testify falsely (either inadvertently or otherwise) at the penalty phase of petitioner's trial regarding the identity of the person who assaulted her in January or February 1986?**

The referee answered yes, concluding that Butler testified falsely when she identified petitioner as her assailant in the trial. The referee identified two main bases for his conclusion. The first was that in sworn declarations submitted with the habeas corpus petition Butler had "recanted" her identification of petitioner as the man who assaulted her. The second was the fact that, in his view, none of the descriptors given by Butler of her assailant fit petitioner.

In a declaration dated November 14, 1999, and attached as an exhibit to the habeas corpus petition, Butler expressed doubt about her identification of petitioner. She explained that at the time she testified in petitioner's case, she was engaging in sex work to support her heroin addiction. She stated that the

attack in the winter of 1986 occurred exactly as she testified. The attacker had a "thick bushy moustache that grew long over his upper lip." The man showed her photos of his children — a boy and a girl. He drove a '60s or '70s model white truck that did not have a camper shell. The interior of the truck was cluttered with trash. There was a tool box in the cab. The man's set of many keys was in the ignition.[3]

Butler further stated that not long after the attack, she was arrested and thought she saw a deputy who looked like her attacker at the Lerdo jail. She knew she had seen him somewhere before. He said he had arrested her in Arvin, but she had never been arrested there.

Butler described her meeting with Deputy Jeanine Lockhart in late 1986 when she looked through a book of photos of deputies and told Lockhart she had recognized the man's photo. Butler stated that when she was back on the streets in

---

[3]  These details were largely consistent with a statement Butler gave to police in 1987, well prior to the habeas corpus investigation. Specifically, in that statement, Butler described her attacker as a white male, between the ages of 45 and 48, "maybe close to 50," five feet, six inches to five feet, eight inches tall, weighing 160 to 175 pounds, strong, with big hands, a chest more filled out than his stomach, brown hair, and a thick, bushy mustache that was not too curly nor straight. She related that the hair on his chest was not very thick because she could see the chest through it. He had more hair on the sides and back of his head than on top and had moles across his back above the waist. She described her attacker's truck as a "nicer" white Chevrolet, late 1970s model, with a gearshift in the steering column, a grey fabric interior, and a bench seat. The truck bed had sideboards that were grey and worn. The cab had a large back window. She described much trash on the floor of the truck, a toolbox and thermos on the passenger side, and a big set of keys in the ignition.

1986 and 1987, there was talk among the sex workers about attacks by a man in a white pickup truck.

Butler stated that she was friends with Tracie Clark, one of the sex workers murdered by Rogers. After Clark was killed and petitioner was arrested, Butler again was in Lerdo jail, and she saw his photo on TV in connection with the killing. Right away, she knew that he might have been the man who attacked her. Someone came to see her in jail the next day and showed her a group of six photos. She selected Rogers, whom she had just seen on TV, as the man who attacked her. She was not certain that her mind had not been influenced by having seen Rogers on TV and having heard about the charges against him.

Butler declared that after her release in April 1987 she did not want to testify against petitioner. She was arrested again and pleaded guilty to possession of heroin for sale in January 1988. Although she was reluctant to testify, some men who she believed were from the district attorney's office came to see her in jail. One of the men told her that petitioner had killed nine women and that Clark had been pregnant and her body mutilated. When she asked if the baby had been cut out, one man said, "Use your imagination." They convinced her she should testify and put petitioner on death row. However, they did not promise anything in return for her testimony.

Butler asserted in her declaration that she lied at trial when she testified she had not seen petitioner's photo on television before she identified him in the lineup. She also related that she lied when she said she had not heard other women discussing petitioner's case in jail. She stated, "No one ever asked me to lie, but the men who interviewed me indicated a lot of things it would not be good to say on the stand." On the

13

day of her release, three months earlier than she expected, she was told petitioner had been convicted and the jailers had been told to "cut [her] loose." After her release, she was arrested again and then let out on bail. Someone from the district attorney's office made contact with her on Union Avenue, telling her that some police officers might think she had done a "bad thing" by testifying against petitioner, and that she should leave California, or she might wind up dead in a ditch. He said if she left the state, "a file would just drop behind a file cabinet and my name would never be mentioned in California again." She moved to Oregon, married, and has been clean and sober since 1989. However, she often worried over the years that she might have testified against the wrong man. She viewed photos of Ratzlaff and heard about his attack on another woman, Lavonda I. She concluded by stating: "I was particularly haunted by one of the photographs. Ratzlaff resembles the man in the white truck and I cannot be sure he was not the man who attacked me in 1986. I am now more concerned than ever that I wrongly identified David Rogers as the man who attacked me." In a second declaration, also dated November 14, 1999, Butler stated that she tried to notice and memorize everything about her attacker, so she could identify him. She stated her attacker did not have a tattoo anywhere on his body.[4]

At the evidentiary hearing, Butler recanted the doubts expressed in her sworn declaration attached to the habeas

---

[4] Petitioner had at the time of the attack on Butler (and continues to have) an easily visible tattoo on the outside of his upper right arm.

corpus petition.[5] She testified that she was positive she had correctly identified petitioner as the man who sexually assaulted her and that it was only because petitioner's investigator had shown up at her house with photographs of Ratzlaff that she had, for a brief period, doubted her identification and signed the declaration. At the evidentiary hearing, Butler was extensively questioned about the discrepancies between her original description of her assailant, given to Kern County District Attorney Investigator Tam Hodgson and other police officers in her February 18, 1987, interview at Lerdo jail, and her testimony at petitioner's trial. She was also extensively questioned about the descriptions of her assailant that she recounted in several conversations she had with Investigator Hodgson during the period between her signing the declaration and testifying at the evidentiary hearing.[6] In these conversations, and in a recently handwritten eight-page overview of her memories of the event that she used to refresh her recollection at the evidentiary hearing, Butler introduced many new details, the most significant of which was that petitioner had also sexually molested her at least three times while she was incarcerated.

The referee found that Butler was not a credible witness at the evidentiary hearing. He found that Butler changed or "fudged" her testimony in order to minimize or explain away the

---

[5] Butler testified under her current married name. To avoid confusion, we will continue to refer to her as Butler, the name she used when she testified at petitioner's trial.

[6] Six conversations — dated October 27, 1998; April 12, 2001; August 4, 2008; October 17, 2008; and October 11, 2011 (two parts) — were recorded and admitted as evidence at the reference hearing.

significant differences between her description of her assailant in her Lerdo jail interview, the details of which she largely reaffirmed in her hearing testimony, and petitioner's appearance in 1987. The referee cited the example of the markings on her assailant's lower back, which Butler had described in her Lerdo jail interview as large black splotches or moles, and which she reaffirmed in her evidentiary hearing testimony, adding that they had "grossed her out." On cross-examination at the evidentiary hearing, when shown a photograph of petitioner's back from that time, she acknowledged that no such dark splotches were evident. Later, on redirect examination, when shown another photograph of petitioner's back and asked whether she saw anything there that reminded her of what she saw on her assailant, she said she saw "disgusting pimples" and described not only seeing them but "feeling" them, a detail she had never previously mentioned.

The referee also pointed to numerous other areas of Butler's trial and evidentiary hearing testimony where she provided inconsistent or inaccurate accounts that undermined her credibility, such as whether or not she had seen petitioner on television before she identified him to the police as her assailant, the crime for which she was in custody at the time she identified petitioner, and her accounts of how petitioner had sexually assaulted her, at least three times, while she was incarcerated at Lerdo jail.[7] The referee observed that the allegation that petitioner had sexually assaulted her when she was incarcerated was a highly significant new detail that would

---

[7] These first two items are discussed in detail below in the following sections.

cast in a new light all her previous statements identifying petitioner as her assailant. But this allegation had not surfaced at trial, and was instead raised for the first time by Butler in a conversation with Investigator Hodgson on October 11, 2011, about a week before the start of the evidentiary hearing.

Butler was questioned about the alleged in-jail sexual assaults at the evidentiary hearing. She initially described three incidents (and later said there might have been a fourth) in which she was brought to an interrogation room by jail staff and left alone there with petitioner, who, during the various sessions, told her to strip naked, sexually penetrated her with an object, and verbally humiliated her. The referee did not believe that Butler would have the ability to recall details of the molestations that she claimed to remember despite the passage of more than 20 years.

The referee also found that Butler's claims that she was sexually molested in the jail were thoroughly impeached by two witnesses who worked as sheriff's deputies at the jail during that time.

Overall, the referee described Butler's evidentiary hearing testimony as being sincere in many respects, and he noted that she attempted to respond to the questions posed to her, but he found that her ability to respond to those questions had been affected by the passage of time since the incidents. The referee noted that Butler admitted being confused, and he felt her credibility at the evidentiary hearing suffered for it.

The referee also based his conclusion that Butler testified falsely at the penalty phase of petitioner's trial on the circumstance that, in his view, none of the descriptions given by Butler of her assailant fit petitioner. Butler described her

assailant during an interview at Lerdo jail on February 18, 1987, as having a thick bushy mustache, big hands, a big hairy chest that was larger than his stomach, and dark moles across his back above his buttocks characterized by Butler as dark splotches.[8] She said that her assailant had no other markings.

The referee noted that, in contrast to Butler's description of her assailant in the Lerdo jail interview, petitioner had a small chest, small hands, and no moles on his back. Petitioner did not have hair on his chest or across the front or down his belly, but he did have a visible tattoo on his right arm. Petitioner never wore a mustache. The referee found unpersuasive the Attorney General's argument that petitioner could have used a theatrical mustache, noting that extensive searches of petitioner and his property uncovered many items of incriminating evidence, such as a gun and tire tracks, but nothing to indicate a mustache or a stun gun, a weapon that Butler described as being used during the assault.

The referee pointed to Butler's original description of the vehicle driven by her assailant as being a white pickup truck with grey weathered sideboards and a cluttered interior. This was important because, as the referee noted, petitioner was driving a light-colored[9] pickup when he murdered Tracie Clark in February 1987, but he did not own that truck or any white

---

[8] As noted, the referee observed that Butler later changed this description in her reference hearing testimony to "ugly pimples."

[9] At trial, witnesses Toby Coffee (who sold the truck to petitioner) and Connie Zambrano (who saw Clark get into petitioner's truck the night before her body was found) both described the truck as beige in color.

pickup until nearly a year after the February 1986 attack on Butler.

Based on these discrepancies between Butler's statements and testimony and the other evidence, the referee concluded that Butler's evidentiary hearing testimony reaffirming her trial testimony lacked credibility. This conclusion, in the referee's view, found additional support in Butler's sworn declarations expressing doubt regarding her trial testimony identifying petitioner as her assailant, declarations the referee implicitly found to be credible.

> **Question 2. Did Tambri Butler testify falsely at the penalty phase of petitioner's trial regarding any other matter, including: (1) Whether she had seen petitioner on television before she identified him as her attacker; [and] (2) Whether she had been promised leniency for her testimony and/or was aware that she would be released early after she testified?**

The referee answered yes, finding that Butler saw petitioner on television before she identified him and testified falsely when she denied having done so. The referee noted that in Butler's October 27, 1998, conversation with Investigator Hodgson, she described how, while incarcerated at Lerdo jail, she first found out that petitioner had committed the murders: "It was like ten o'clock at night and the news came on and they flashed his face . . . . I saw his face that night, for the first time I realized he wasn't a bad cop that raped me, he was a bad cop that raped and murdered several people . . . then the next morning you guys [the detectives] were there."

The referee pointed to Butler's testimony at the evidentiary hearing in which she described what she saw on

television while she was in Lerdo jail. Butler testified she had been reading a book when her friend and cellmate Kathleen Davis said, "Oh my God there he is," and alerted Butler to the news on television. Butler saw a Kern County Sheriff's badge being flashed on the screen. On redirect examination, Butler said "just as I glanced up, it went from a face to a badge."[10]

The referee also found that Butler had testified falsely at trial when she denied talking to the other inmates at the jail about having been assaulted. Butler's description of how her cellmate alerted her to a news broadcast about petitioner (by saying "Oh my God there he is!") indicated that Butler had previously discussed the assault with her. And Butler's testimony — that the only reason she agreed to be interviewed by the police about her assault was because she had received 150 or 175 letters ("kites") from the men in jail urging her to do so — also indicated that Butler had discussed her assault with other inmates.

The referee found that no express promise of leniency had been made by the authorities, but that Butler was aware that, if she testified at petitioner's penalty trial, she could be released early. In particular, the referee pointed to Butler's statement, during her October 11, 2011, phone conversation with Investigator Hodgson, that "No, they [the authorities] made it clear that I wasn't going to get out just because I testified, but you know, I'm not stupid. I knew if I testified I'd get to go home. I knew that."

---

[10] The Attorney General's posthearing brief argued that instead of seeing petitioner on television, Butler had seen a still photograph of petitioner. The referee found that this argument was not supported by the evidence.

Finally, the referee found that Butler also testified falsely when, upon being asked, "What are you in custody for?" she answered, "For possession of heroin." The referee noted that it was undisputed that, in fact, Butler was in jail not for simple possession of heroin but for the far more serious charge of felony possession of narcotics for sale, in violation of Health and Safety Code section 11351, a crime of moral turpitude. (See *People v. Castro* (1985) 38 Cal.3d 301, 317.)

The referee acknowledged the Attorney General's contention on this point that Butler was not trying to mislead anyone, observing that she had testified truthfully about some of her other arrests and that it was clear she was a recidivist sex worker and drug offender. Nonetheless, the referee found her false testimony, whether inadvertent or otherwise, about the reason for her arrest was material to her credibility as a witness.

> **Question 3. Is there newly discovered, credible evidence indicating that petitioner did not assault Tambri Butler in 1986, including evidence that another person committed the assault? If so, what is that evidence?**

The referee answered yes, referring to his answer to Question 1 above concerning false evidence, which was based on Butler's recantations of her trial testimony and which indicated the differences between her descriptions of her assailant and petitioner's appearance.[11] Overall, the referee concluded that

---

[11] In this section of the findings, the referee listed the following physical characteristics of Butler's assailant that differed from those of petitioner and could be attributed to a third party: (1) a long thick mustache curling over the lip, (2) a layer of hair covering, but not obscuring, his chest and abdomen,

the similar patterns of the newly discovered evidence concerning the Michael Ratzlaff assaults, described briefly below and in more detail *post,* pages 32–35, combined with the differences from Butler's description of her assailant, supported the inference that someone other than petitioner committed the attack on Butler.

The referee described the following "striking" parallels between the Butler assault and documented attacks by Ratzlaff on Lavonda I. and other women, including Jeannie S., Deborah C., and Dealia W.: Deals were made on Union Avenue. The assailant insisted on going out to a remote area in the country. The sex started with fellatio. The assailant could not perform. More money was agreed on for the woman to continue. The woman said it was taking too long to consummate the sexual act and she wanted to go back to Union Avenue. The assailant flew into a violent rage, fired warning shots, and used a stun gun. The victim received anal abuse and was then robbed and left on a country road. The assailant had a bushy mustache and drove a light-colored pickup with sideboards and a cluttered interior. The referee concluded that this pattern supported the inference that an assailant other than petitioner committed the assault on Butler.

## IV. ATTORNEY GENERAL'S EXCEPTIONS TO THE REFEREE'S FINDINGS

With respect to Question 1, whether Butler testified falsely in identifying petitioner as her assailant, the Attorney General

---

(3) extremely big hands, (4) thick hair, (5) a big chest, (6) a big, crowded keychain, (7) a white pickup with weathered sideboards, (8) a tool chest and large silver thermos, (9) a litter-strewn truck cab interior, and (10) a stun gun.

takes exception to the referee's findings concerning Butler's credibility as a witness, including the weight to be accorded her expressed doubts, the finding that Butler changed her recollections numerous times, and the believability of Butler's recent accusations that petitioner sexually molested her while she was incarcerated. The Attorney General also contends that the referee's findings do not establish that Butler's identification was "actually" and "objectively" false. (See *In re Richards* (2016) 63 Cal.4th 291, 293.) Specifically, the Attorney General disputes the referee's findings concerning the differences in appearance between petitioner and Butler's description of her attacker and contends that the style of the attack on Butler was different from Ratzlaff's attacks on the other sex workers. Additionally, the Attorney General takes exception to the referee's findings that Butler testified falsely as to other matters, such as her expectations for an early release from jail as a result of testifying, whether she saw petitioner on television while she was incarcerated at the county jail, and her testimony concerning the crime for which she was serving time when she testified at petitioner's trial. Finally, the Attorney General contends that, even if the referee's findings are accepted, relief is unwarranted because there was no reasonable probability that a different result would have been reached in the absence of the claimed errors.

## V. DISCUSSION

" 'A writ of habeas corpus may be prosecuted' where '[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to his or her incarceration.' (§ 1473, subd. (b)(1).)" (*In re Figueroa* (2018) 4 Cal.5th 576, 588.) A petitioner bears the burden of proving, " ' "by a preponderance

of the evidence, facts that establish a basis for relief on habeas corpus." ' " (*In re Cox* (2003) 30 Cal.4th 974, 998.)

"[O]ur review of the referee's report follows well-settled principles. The referee's factual findings are not binding on us, and we can depart from them upon independent examination of the record even when the evidence is conflicting. [Citations.] However, such findings are entitled to great weight where supported by substantial evidence." (*In re Hamilton* (1999) 20 Cal.4th 273, 296.) "Deference to the referee is called for on factual questions, especially those requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying." (*In re Malone* (1996) 12 Cal.4th 935, 946.) " '[A]ny conclusions of law or resolution of mixed questions of fact and law that the referee provides are subject to our independent review.' " (*In re Cox*, *supra*, 30 Cal.4th at p. 998; see *In re Scott* (2003) 29 Cal.4th 783, 818 ["We ask our referees only to make findings on disputed factual questions; we then resolve the legal issues ourselves"].) In general, however, " 'the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion.' " (*In re Roberts* (2003) 29 Cal.4th 726, 742.)

Preliminarily, we observe that although the questions posed to the referee encompass a variety of matters embraced within the order to show cause, the central issue before this court is whether Butler falsely identified petitioner as her assailant. Petitioner bears the burden of proof on this question by a preponderance of the evidence. Given the nature of the false evidence claim here and the relevant facts, petitioner can meet this burden by proving it is more likely than not that someone else, not petitioner, in fact assaulted Butler. Throughout his

briefing, the Attorney General argues that petitioner has failed to prove that Butler *intentionally* gave false testimony at trial and at the hearing, but section 1473 does not require a petitioner establish that a witness knowingly or intentionally testified falsely, provided the false testimony was material to his or her conviction or sentence. Subsidiary questions concerning whether Butler gave false testimony in other respects going to her general credibility are significant only to the extent the answers to those questions illuminate the central issue of the truth or falsity of her identification of petitioner.

A subsidiary question may relate directly to the truth of the identification. For example, the question whether Butler testified falsely at trial when she claimed not to have seen petitioner's postarrest image on television while in jail and before her interview with investigators bears not only on her general credibility, but also on the question whether her identification of petitioner was tainted, and thus made less reliable, by virtue of her having seen his image in that context. Other questions, including whether statements Butler made in her declarations reflect "uncertainty about the prior identification, rather than a positive belief the identification was wrong" are not determinative of the truth of her trial testimony, and need not be extensively addressed here. We will accordingly focus primarily on the record and findings that relate directly to the reliability of Butler's identification testimony.

For the reasons discussed below, we conclude that petitioner is entitled to relief because material false evidence was presented at his trial, namely that Butler testified falsely both in her identification of petitioner and concerning the circumstances surrounding it.

## A. Truth or Falsity of Butler's Identification

### 1. Butler's recantation

"[T]he offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion." (*In re Weber* (1974) 11 Cal.3d 703, 722.) The Attorney General contends that the circumstances under which Butler's declarations expressing doubts regarding the accuracy of her trial identification of petitioner were obtained and prepared render them highly suspicious and tend to show that Butler signed them out of expediency and to avoid possible retaliation from petitioner's friends.[12] In the Attorney General's view, Butler could reasonably have construed Defense Investigator Ermachild's visit as pressure to tell a particular story by an agent of a multiple murderer who still had friends and strong supporters in the Kern County law enforcement community. The Attorney General contends that, as far as Butler knew, Investigator Ermachild could have called the police and had Butler arrested on the warrant for violating felony probation that Butler had generated when she left the state.

However, although the Attorney General speculates that Butler *might* have felt threatened or pressured in these ways to give Ermachild a declaration useful to petitioner, he points to no

---

[12] There are three declarations: (1) a handwritten declaration prepared the day that Defense Investigator Melody Ermachild visited Butler in Butler's home on November 14, 1999; (2) a typed declaration, also dated November 14, 1999, that Ermachild prepared later, which was based on the handwritten declaration plus additional comments Butler had made during her interview with Ermachild that day; and (3) a supplemental typed declaration, also dated November 14, 1999, containing the additional point that Butler did not see a tattoo anywhere on the body of her assailant.

statement by Butler indicating that she ever actually felt pressured or intimidated. In Butler's evidentiary hearing testimony and in her recorded telephone conversations with Investigator Hodgson, Butler did in places repudiate some of the statements in her declarations, but did not do so on the basis that she had been threatened or compelled to make them. For example, in a conversation with Investigator Hodgson, Butler described her statements in the declarations as resulting from distress and confusion arising from the visit of Ermachild, who created doubts in her mind by showing her the photographs of Ratzlaff, whom Butler immediately found chillingly similar to her memory of her assailant. This does not, however, indicate that Butler was intimidated into signing the declarations. What is reflected in Butler's testimony at the evidentiary hearing and her statements in her recorded conversations with Investigator Hodgson is that the doubts she had upon seeing the photographs of Ratzlaff were genuine, even though she subsequently asserted that she had nonetheless correctly identified petitioner as her assailant. The Attorney General also points out that Ermachild did not tell Butler of Ratzlaff's height, which did not align with Butler's previous descriptions of her assailant. Notably, however, Butler signed her declarations following Ermachild's second, noticed visit, after consulting telephonically with Hodgson and availing herself of the opportunity to make interlineations and deletions in a draft version of the declaration, all of which suggests that she was aware of their contents when she did so. We are unpersuaded that we should entirely discount Butler's declarations based on the circumstances under which they were prepared.

Next, the Attorney General contends that Butler's declarations, even if not coerced, are insufficient to repudiate or

undermine Butler's trial testimony. He compares the declarations and contends that Ermachild added an introductory sentence to the typed declaration — "I now believe my identification of Rogers was wrong" — that did not accurately reflect Butler's sentiments expressed during her interview with Ermachild.[13] The Attorney General points to Butler's statement in a later paragraph stating "I have often worried over the years that I might have testified against the wrong man. I've always questioned how accurate my identification of Rogers was, though when I saw him in the courtroom I felt sure he was the man who attacked me. For years, I've told my husband that I am now uncertain and it weighs on my mind." The Attorney General contends that this later statement "expresses uncertainty about the prior identification, rather than a positive belief that the identification was wrong," and, as such, is insufficient to repudiate or undermine Butler's trial testimony. As noted, however, Butler's testimony and statements she made to Investigator Hodgson reflect genuine doubt regarding her identification of petitioner. In any event, it is whether *petitioner* assaulted Butler, not the precise degree of her certainty or uncertainty in her identification of him as her assailant, that is the ultimate question before us, and her declaration is not the sole piece of evidence that petitioner has brought forward to support his false evidence claim. Rather, it is evidence that, along with the other evidence presented at the evidentiary hearing, including that of Michael Ratzlaff's commission of other

---

[13] The Attorney General acknowledges that neither petitioner nor the referee relies on the paragraph of the declaration that contains this sentence.

similar, roughly contemporaneous assaults on Bakersfield sex workers, supports petitioner's false evidence claim. And even taking into consideration any tentativeness in the declarations regarding Butler's misidentification of petitioner at trial, in other important respects (specifically regarding having seen petitioner's image on TV the night before identifying him to investigators, and investigators' allegedly falsely telling Butler about other murders petitioner was suspected of committing) they reflect inconsistency with her trial testimony.

### 2. *Differences in appearance between petitioner and Butler's description of assailant*

The Attorney General contends that three of the most significant differences — the mustache, the stun gun, and the white truck — were all details that could have been altered or hidden by the assailant. But as the referee noted, extensive searches of petitioner and his property uncovered many items of incriminating evidence, such as a gun and tire tracks, but nothing to indicate a mustache or a stun gun, a weapon that Butler described as being used during the assault. The Attorney General also points to the height of the assailant, a detail of Butler's description which is more similar to petitioner than to Ratzlaff. In the 1987 jailhouse interview Butler described her assailant as shorter than her height of five feet eight and a half inches and estimated his height as between five feet six and five feet eight inches. Petitioner is five feet, eight or nine inches tall. Ratzlaff was six feet, three inches tall. The Attorney General argues that the height difference between petitioner and Ratzlaff should be considered a more significant detail than the mustache, the stun gun, or the truck because it was unalterable by the assailant.

However, considerable doubt exists regarding Butler's estimate of the height of her assailant.  In her 1987 jailhouse interview she stated that she never stood next to her assailant, which would have been the most accurate way to have estimated his height.  The Attorney General argues that Butler was nonetheless able to estimate his height by sitting next to him in the cab of the truck and that she stated in her 1987 interview that at one point she saw him standing outside next to the truck.  Her handwritten recollections of the assault, prepared shortly before her testimony at the hearing, similarly mentioned her assailant walking around the front of the truck as she was putting on her clothing, as well as a later instance when he was standing outside the car of another of her clients while she was inside.  However, these opportunities for estimating her assailant's height were subject to a greater range of misestimation than an estimate done while standing next to her assailant.[14]

Consistent with her pattern of belatedly raising new details, Butler stated in her August 4, 2008, conversation with Investigator Hodgson that she could tell that her assailant was

---

[14]    The Attorney General also observes that, although Butler did not in her February 18, 1987, interview with investigators mention seeing a tattoo on her assailant, she also told them he was wearing a plaid shirt and did not take off his clothes, suggesting the tattoo may not have been visible. Yet Butler was inconsistent regarding whether her assailant removed his shirt, stating, in her November 14, 1999, declaration, that "[w]hen I was raped and assaulted in 1986, I tried my best to notice and memorize everything I could about the man and his truck, so that I could identify him later.  Because of this, I know that I would have noticed if the man had an identifying mark like a tattoo.  As I recall, the man took off his shirt, so I saw most of his upper body.  I did not see a tattoo anywhere on his body."

approximately her height because, while he was standing behind her sodomizing her, he clamped his chin over her shoulder to keep her in place. Butler stated that her assailant was pressed flat against her back and that this confirmed that he could not have been significantly taller than she was because a taller man would have had to squat or curve his body and consequently could not have been pressing against her. Petitioner responds that Butler's account is physically impossible. This dispute need not be definitively resolved. Suffice it to say that Butler's basis for estimating her assailant's height is problematic for a number of reasons, and is insufficient to convincingly show that her assailant was around her height or shorter.

### 3. Style of the attacks

As summarized above, the referee's findings concerning Question 3 set forth the many parallels between the assault on Butler and newly discovered evidence of Ratzlaff's documented assaults on other sex workers. These included: (1) the assailant picked up his victims on Union Avenue and then insisted on driving to a remote area in the country; (2) although apparently under the influence of alcohol, the assailant was initially pleasant, but later became violent; (3) the sex started with fellatio, but the assailant could not complete the act; (4) the victims complained the act was taking too long and asked for more money to continue; (5) the assailant went into a violent rage, fired warning shots and used a stun gun (see *People v. Sánchez* (2016) 63 Cal.4th 411, 452-453 [observing that owning a stun gun was unusual in 1990 and 1992]); (6) the victims were anally raped, robbed, and left on the country road. The Attorney General, however, contends that Butler's assailant showed the "controlled sadism" that he asserts characterized petitioner's

attacks on sex workers, rather than the "explosive rage" that he asserts characterized Ratzlaff's attacks. The point is best exemplified by Ratzlaff's attack on one of the other sex workers, Jeannie S., briefly mentioned *ante*, page 22, in which the victim was beaten so badly she had to be hospitalized. Such an attack indeed suggests explosive rage. However, because Jeannie S. had no memory of the attack, we do not know any of the details of what happened before or during that attack.

Ratzlaff's attack on Lavonda I., however, on the whole displays brutal force exercised in a controlled manner, although it does contain at least one act that could be characterized as explosive violence. A somewhat detailed account of the attack, taken from Lavonda I.'s testimony at the successful prosecution of Ratzlaff for the assault, is necessary to highlight the similarities to Butler's attack and respond to the Attorney General's argument.

On May 21, 1988, Lavonda I. was a sex worker on Union Avenue when a man in a white Ford pickup truck (later identified as Ratzlaff) drove up and negotiated a "blow job" for $20. Lavonda I. wanted to perform the act in her motel room, where she felt safe, but Ratzlaff refused to do that. He offered her an extra $20 if she would go with him, to which she agreed. They drove for 15 to 30 minutes on a road out into the country. On the way, she engaged in what she described as "normal conversation" with Ratzlaff (asking whether he was married and what he did for a living) and he "acted like a normal person." She noticed a strong smell of alcohol on his breath, although he did not have any difficulty speaking.

After he stopped the truck out in the country, she began to fellate him. After 15 to 20 minutes she stopped because he was

unable to achieve an erection. She wanted to leave, but he offered to pay an extra $20 if she would stay a little longer, to which she agreed. After continuing for another 15 to 20 minutes unsuccessfully, she again stopped and asked to be taken back to town. Once again, he asked her to keep going for a little longer, but she refused.

He then pointed a pistol at her temple. Thinking it was a fake, she asked him if it was real, and he responded by shooting a cup of Pepsi that was on the floor of the truck. He then told her to stick her hands out in front of her and bound her with plastic handcuffs. He told her to lie back, and inserted his fingers and eventually his entire hand into her vagina. When she cried out in pain, he threatened to shoot her in the stomach. He also inserted his hand into her rectum.

Next, he told Lavonda I. to get out of the truck and urinate in front of him. After she tried to do so unsuccessfully for a minute or two, he told her he had something that would help her go, and pulled a stun gun from the top of the dashboard of the truck. He stunned her repeatedly on her stomach and the outside of her vagina while she screamed in pain.

Somehow, Lavonda I. managed to break the plastic handcuffs and tried to kick him in the groin but was unsuccessful. He struck her with great force several times in the face and head and threw her down on the ground where she hit her head on something hard, perhaps cement. She gave up and said, "If you are going to kill me, get it over with and do it now." He told her he wasn't going to kill her but was just going to do a few other things and then let her go. He took out a Polaroid camera and took four or five pictures of her in intimate poses. Then he had her stand up and handed her her clothes

and told her to run. She ran away holding her clothing. She heard several shots while she was running and heard him get into his truck and drive off.

Ratzlaff had beaten her so violently in the face that she lost her front teeth. The Attorney General cites this as an example of Ratzlaff's pattern of losing control in explosions of rage involving a high degree of physical violence. However, as the above account illustrates, in this assault Ratzlaff generally showed the same kind of controlled and manipulative brutality that was characteristic of Butler's attacker. He inflicted the most physical violence when Lavonda I. fought back and attempted to attack him. Once he regained control, he stopped beating her, and returned to manipulating and degrading her with the photographs, and ultimately let her go. The Attorney General contends that Ratzlaff fired wildly after Lavonda I. as she ran, for no good reason other than rage. Her testimony, however, does not indicate that he shot after her. Rather it appears that he was shooting in the air or in the distance to further terrorize her. In those respects, his assault on Lavonda I. can be said to resemble that made on Butler. Although, unlike Lavonda I., Butler did not claim that her assailant beat her — instead stating he slapped her, stung her with a stun gun, and fired a gun near the bridge of her nose — she did describe a similar pattern of violent threats aimed at securing her compliance with his demands. We are therefore unpersuaded by the Attorney General's argument that the beatings Ratzlaff inflicted on his other known victims so markedly distinguish those attacks from the assault on Butler as to preclude a finding that he was responsible for the latter.

Additionally, the Attorney General seeks to characterize petitioner's attacks on his two murder victims, Benintende and

Clark, as exhibiting controlled sadistic violence to further support the contention that those attacks were more similar to the attack on Butler than Ratzlaff's attacks. The problem, however, is that there is little evidence concerning the details of petitioner's attacks on his victims. Regarding Benintende's murder, petitioner denied committing it, and the evidence linking petitioner to this murder was entirely physical circumstantial evidence — the same gun and type of police-issued ammunition that shot Clark, also shot Benintende. (*Rogers*, *supra*, 39 Cal.4th at p. 840.) With regard to Clark's murder, the only details about the immediate events leading up to it come from petitioner's confessions. In his confession to the police, he described pulling out his gun when he got into an argument with his victim, accidentally shooting and wounding her, and then panicking and shooting her intentionally when she threatened to report him. (*Rogers*, *supra*, 39 Cal.4th at pp. 838-839.) In his sodium amytal confession, he described how he lost control after his victim taunted him by calling him a homosexual and he irrationally felt threatened by her. (*Id*. at pp. 843-844.) Neither account suggests controlled sadistic violence. Although the Attorney General may regard petitioner's accounts of the Clark murder as self-serving, he points to no evidence showing that petitioner's murders were accomplished in a style that reflects controlled sadism.

### B. Referee's Findings that Butler Had Testified Falsely Concerning Other Matters

#### 1. *Early release from jail*

The Attorney General takes exception to the referee's finding that Butler had been aware that she would be released early after she testified. The Attorney General contends that the only statement by Butler cited by the referee supporting this

finding[15] had been made in a telephone call to an investigator expressing anger and frustration regarding her living circumstances and having to testify at the evidentiary hearing, which, she thought, could subject her to arrest and incarceration. The Attorney General contends that subsequent statements by Butler show that it was only jail folklore that led Butler to believe she would somehow be released early if she testified. He contends that neither the findings nor the new evidence disproves Butler's trial testimony that, at the time she testified, she did not "expect any help," and in fact she did not hope for an early release but wanted to do her time because she was not "totally cleaned up."

The Attorney General further contends there is no evidence that any decision to direct Butler's release was made before the judgment of death was imposed, which was more than a month after she testified. Therefore, he contends that because there was neither an explicit nor an implicit arrangement, or even evidence of an arrangement, she could not have been "aware" that she would be released early. In other words, his argument is that Butler could not have been aware of an agreement to have her released early because no such agreement was ever formed, and therefore she could not have been aware of something that did not exist.

The issue, however, is not whether some legally cognizable agreement was ever formed between Butler and the authorities. What is important is her psychological *belief* — what the referee

---

[15] Specifically, Butler stated, "No, they [the authorities] made it clear that I wasn't going to get out just because I testified, but you know, I'm not stupid. I knew if I testified I'd get to go home. I knew that."

meant by "awareness" — that she would be creating the *possibility* that she *might* be released early by cooperating and testifying in a way that she thought the authorities wanted her to. That her belief was based on something less than a legally binding contract, and thus on something less than certainty that she would gain the hoped-for benefit, does not undercut the referee's finding.

As a further argument that there was not even an implicit agreement for her early release, the Attorney General contends that the authorities' only motivation to release her early after petitioner received his death sentence was their concern for her safety, something that was independent of any benefit that Butler had conferred on the authorities by testifying. But, once again, the issue that the referee's finding and Butler's statement to Investigator Hodgson ("I'm not stupid" and "I knew if I testified I'd get to go home") referred to was her motivation and belief in the period before her testimony at petitioner's trial. The fact that the authorities had, in the period after she testified at petitioner's trial, a theoretically independent reason for ordering her release from jail does not retroactively change Butler's motivation and belief in the period before her testimony.

### 2. *"Fudging" or changing her testimony*

The Attorney General takes exception to the referee's finding that Butler was not credible in parts of her evidentiary hearing testimony because she "fudg[ed] or chang[ed] her testimony" and presented "inconsistent stories [that] changed numerous times." The Attorney General contends that the referee's statement about Butler's "fudging or changing her testimony" was not the equivalent of a finding that Butler

"intentionally testified falsely at the reference hearing." However, the referee did not have to determine that Butler engaged in perjury at the evidentiary hearing to find aspects of her testimony not credible.

The two examples of Butler's fudging or changing her testimony that the referee identified concern (1) the dark moles that she, in her 1987 jailhouse interview, recounted seeing on her assailant's back and (2) her allegations, first disclosed to Investigator Hodgson in 2011 shortly before the evidentiary hearing, that petitioner sexually molested her at least three times while she was incarcerated in the county jail. As to the first, the Attorney General acknowledges that a photograph of petitioner's back at the time of trial showed small rounded reddish spots but no dark spots, and that the referee did not credit Butler's new characterization, in her evidentiary hearing testimony, of the dark moles as pimples that she remembered feeling. The Attorney General contends this testimony fits the referee's description of Butler making a "sincere attempt to respond," but because "so much time had passed," her response was unconvincing. He observes that the referee did not expressly find that Butler's testimony in this regard was "willfully false." But, once again, the issue is not whether her testimony fits the formal definition of perjury. The "pimples" testimony undercuts Butler's credibility because, as the referee explained, it reflects a pattern in which she changed her previous story and raised significant, never-before-mentioned details that had the effect of shoring up her identification of

petitioner as her assailant.[16]   Whether Butler did this intentionally or subconsciously or somewhere in between is not something the referee had to decide in order to find that it undercut Butler's credibility.

### 3. *The jailhouse sexual molestation accusations*

The most significant example of this pattern of adding new details was Butler's allegation that petitioner had sexually molested her at least three times while she was incarcerated in Lerdo jail.  The Attorney General attempts to fit this explosive new allegation within the context of Butler's previous statements, repeating her explanation that she had in fact alluded to these molestations when she mentioned in her 1987 jailhouse interview that she had "had a lot of trouble" in county jail after she had recognized petitioner as working there.[17]

---

**16**   In a later section of his findings, the referee cited an instance of the same pattern of Butler's bolstering her identification.  During her trial testimony, she suddenly said for the first time, regarding her assailant, "I think he told me his name was David."

**17**   In the 1987 interview, the topic arose in the following way. Detective Mike Lage asked Butler why she did not identify petitioner when Deputy Lockhart supplied Butler with a copy of the "Behind the Badge" annual (which had photographs of all the Kern County deputy sheriffs):

"[Detective] Lage:  Why didn't you say anything?

"Tambri [Butler]:  I was in jail.  You know.  The man wasn't in jail.  I wanted to get out of jail.

" [Detective] Lage:  Did you think something might happen to you?

"Tambri [Butler]: Yeah, I did.  Because the last time when I was in and I recognized him I kept my mouth shut.  And you know, I had a lot of trouble when I was in jail then.  I didn't want no more trouble."

Butler testified at the evidentiary hearing that she had been referring to the jailhouse molestations by petitioner when she said she had "had a lot of trouble" in jail. She first mentioned the in-jail molestations in her October 11, 2011, conversation with Investigator Hodgson. She initially told Hodgson that she had previously mentioned these allegations to him, but Hodgson firmly denied that he had ever heard such allegations before. On cross-examination, when asked why she had never brought up the in-jail molestations previously, she stated that in the 1987 jailhouse interview she "didn't go into detail" because she "didn't feel it necessary." Concerning why she had never mentioned them during her numerous conversations with Investigator Hodgson in 1998, 2001, and 2008, she stated that because petitioner by that point was already on death row, she did not want to humiliate or mortify herself further with "any more details that were just not necessary." Even setting aside the plausibility or implausibility of those responses, however, one would reasonably expect Butler to have mentioned the molestations in her trial testimony concerning her contacts with petitioner in the jail and how she was able to recognize him as the man who had assaulted her, and her failure to do so cuts heavily against her credibility.

The Attorney General cryptically concludes that "the evidence presents no other explanation for her 1987 statement," apparently meaning that the only way to understand her statement in her 1987 jail interview that she had "had a lot of trouble" while in jail is to conclude that it referred to her 2011 accounts of in-jail sexual molestations by petitioner. But in the very same conversation with Investigator Hodgson in which Butler described the in-jail molestations, she also described another incident in which she had gotten in trouble in jail after

being accused of slandering a female officer by calling her a homosexual. Indeed, Butler attempted to connect the slander incident to the in-jail molestations by saying that because of the slander accusation she was taken out of her cell and interviewed by a male officer in the interrogation room. When the first officer left, Butler claimed petitioner walked in, closed the door, and raped her. The more plausible explanation of her "had a lot of trouble" allusion in 1987 is that it referred to the trouble she got into when she was accused of slandering the female deputy.

The Attorney General also takes exception to the referee's finding that Butler's account of the in-jail molestations was thoroughly impeached by the testimony of two deputy sheriffs who worked in the jail at the time, who described the proper procedures and working practices at the jail. The Attorney General contends that their testimony did not preclude the possibility that a deputy could, if he chose, disregard proper procedures and take an inmate downstairs to an interview room. Petitioner, of course, cannot prove a negative — that the in-jail molestations never happened. But given the implausibility and contradictions involved in Butler's accounts of the molestations, we accept the referee's finding that Butler's account was thoroughly impeached.

### 4. Whether Butler saw petitioner on television and her recognition of petitioner at the county jail

The Attorney General does not dispute the referee's finding that, contrary to her trial testimony, Butler saw petitioner on television while she was incarcerated at the county jail and on the night before her interview with investigators. The finding is supported by Butler's October 1998 conversation

with Investigator Hodgson.[18]    In her equivocal hearing testimony on the point (in which, notably, she denied even having been asked, at trial, whether she had seen petitioner on television), Butler failed to give a satisfactory explanation of the discrepancy.    Nevertheless, the Attorney General contends, Butler had recognized petitioner before seeing him on television, and seeing him on television therefore did not affect her identification.  The Attorney General points out that the referee accepted that Butler had seen petitioner in the jail before his arrest and the referee did not specifically discount Butler's evidentiary hearing testimony that she only glanced at the first news story she saw and then immediately became upset and afraid.  These circumstances, according to the Attorney General, establish that Butler's false trial testimony that she did not see petitioner's picture on television does not significantly undermine the credibility of her identification of petitioner as her attacker because she had already recognized him.   As explained below, however, petitioner was not required to prove a direct causal link between Butler's seeing his picture and her misidentification.   The referee was entitled to rely on this collateral falsehood in evaluating the truth or falsity of Butler's identification.

Butler's accounts of recognizing petitioner at the county jail are as follows.  In her February 1987 jailhouse interview,

---

[18]    As mentioned *ante*, in that conversation Butler described how, while incarcerated at Lerdo jail, she first learned that petitioner had committed the murders:  "It was like ten o'clock at night and the news came on and *they flashed his face . . . . I saw his face that night*, for the first time I realized he wasn't a bad cop that raped me, he was a bad cop that raped and murdered several people . . . ."  (Italics added.)

Butler described how, at some point several months after her assault and after several visits to her incarcerated boyfriend at the county jail, she "kept seeing this cop."  She "kept looking" at the officer and told him she knew him from somewhere and that he drove a white truck.  At first, he said she didn't know him, but then he said, "Yeah, I arrested you in Arvin for under the influence" in his white squad car.  After Butler insisted that she had never been arrested in Arvin, only in Bakersfield, she had a revelation — "like somebody lifted a sheet" — that this was her assailant.  The uniform had thrown her off.  She looked at him "real hard" and he asked her whether she saw something that she recognized or knew.  She "got real smart with him, and said yeah I see something and I won't soon forget."  He told her, "I suggest if you want that visit you turn your ass around and keep your mouth shut."

In her testimony at petitioner's trial, she gave a much more abbreviated version of these events, only mentioning in her direct examination that she had recognized petitioner while visiting her boyfriend in the Kern County jail.  In cross-examination, she gave a version of the story in which *she* was incarcerated and her boyfriend was visiting her.  She asserted that in the process of being taken to the visiting room on the "A Deck," she saw and recognized petitioner.  In her trial testimony, she did not mention talking to petitioner on the A Deck.

In her evidentiary hearing testimony, she gave a version of recognizing petitioner that was like the account in her February 1987 jailhouse interview, except that her interaction with petitioner was more vivid.  After realizing who he was, she "star[ed] him down" with "vengeance" and "hate."  After he heard her say, "I know who you are, you son of a bitch," "he got

right in [her] face" about three inches away, and said, in a quiet but threatening tone, that he knew who she was and she knew who he was, and that she had time to do and she could do it either the hard way or the easy way.[19]

As described above, the referee found that petitioner had not, in fact, previously arrested Butler. However, based on evidence submitted by petitioner, the referee found that petitioner had previously given Butler a notice to appear when she was leaving jail, which both petitioner and Butler signed. The referee found that this credible evidence established that there was some contact between them at that time because they both signed the notice at the same time and in the same area.

The Attorney General also points to the fact that Butler mentioned in her 1987 jailhouse interview that, starting about two days after the assault, she believed her assailant began stalking her. She first saw him watching her perform oral sex on a customer in a car, and then saw him several more times: two or three days later when he drove by; about a week after

---

[19] Butler's 1999 declarations described her recognition of petitioner in the Lerdo jail as follows: She had been arrested and was in booking when she saw a deputy sheriff "who looked like the man who attacked me. I'd been arrested and I was in booking. The deputy I thought I recognized wasn't actually booking people. He was standing drinking a cup of coffee and he seemed to notice or recognize me. I looked at him and I thought he was the man who attacked me. I cursed him and he told me words to the effect of turn around and be quiet. I felt frightened by him, because I thought he was the one who had attacked me, although nothing he said was actually threatening or indicated he was the man who attacked me. I cannot recall if he had a moustache. I knew I had seen him somewhere before. He said he had arrested me before, in Arvin, but I had never been arrested in Arvin."

that when she saw him sitting on his truck watching her; and sometime later when he parked and gestured for her to come to his truck, which she ignored. The Attorney General contends that these later stalking episodes are additional instances, closer in time to the assault, when Butler saw petitioner, further reducing the significance of her seeing petitioner's picture on the television.

There is no reason to doubt the Attorney General's underlying premise that a witness's repeated opportunities to see a person could mean that a later observation does not matter because the witness already knew what the person looked like. Additionally, here, as the referee found, there appears to be no question that Butler and petitioner interacted in the jail before Butler saw his picture on the television. But establishing the *extent* of Butler's prior observations and recognition of petitioner relies on Butler's own credibility, which the referee reasonably found was suspect.[20] We have highlighted evidence of Butler's propensity to change her story and to add significant details bolstering her accusations against petitioner. To cite but a few significant examples: At the evidentiary hearing Butler gave inconsistent versions of the incidents in which she claimed petitioner molested her in jail, and for the first time asserted that what she had previously described as dark moles on her

---

[20]    Unlike the witness Cade in *In re Roberts, supra,* 29 Cal.4th at pages 743-744, cited by the Attorney General, aside from giving broadly consistent testimony at trial and at the evidentiary hearing, Butler also signed a declaration containing statements markedly inconsistent with her testimony at either proceeding. The referee here thus had a valid justification to reassess her credibility. In this context we therefore do not defer to the jury's credibility determination.

assailant's lower back were "disgusting pimples" that she discerned on a photograph of petitioner's back, and even claimed to have touched during the assault. And at trial she had claimed for the first time that on the night she was attacked, her assailant had said his name was David. Moreover, Butler's assertion that she saw her assailant several times after the attack in the stalking incidents presupposes the ultimate issue — that petitioner was Butler's attacker.

### 5. Butler's testimony concerning the crimes for which she was arrested

As described above, the referee found that Butler testified falsely when she answered the question "What are you in custody for?" by stating possession of heroin, instead of her more serious actual crime of felony possession for sale. The Attorney General argues that the question asked was a general one, and Butler may have reasonably answered in kind with a general description of her conduct rather than a precise specification of the crime for which she was incarcerated. In any event, he contends, even if she testified falsely in this respect, the falsehood was not significant. He points out that Butler admitted to the jury that she remained a sex worker and drug addict despite having suffered multiple convictions and served multiple terms in jail for prostitution and drug offenses.

We cannot say the referee's finding — that Butler's characterization of the offense was so obviously watered down that it rose to the level of a false response — was unsupported by the evidence. The referee could reasonably believe that Butler, who had been arrested numerous times, would have known that felony possession for sale is an offense fundamentally different from simple possession. Moreover, as with the testimony regarding the television broadcast, the

referee was entitled to consider Butler's answer in connection with the general issue of her credibility as a witness. Indeed, we note that felony possession of drugs for sale is a crime of moral turpitude that trial counsel might have used for impeachment purposes. (*People v. Castro, supra,* 38 Cal.3d at p. 317.)

### C. Summary and Conclusions Regarding Referee's Findings

The record is not entirely devoid of evidence supportive of an inference that Butler testified sincerely and truthfully at petitioner's trial — principally the match between Butler's description of her assailant's height and petitioner's height and her coming forward to Deputy Lockhart, claiming she had recognized her assailant as someone who worked in the jail although she did not then identify petitioner. Nevertheless, given the great weight to which a referee's findings are entitled when, as here, they are supported by substantial evidence, we accept our referee's finding that Butler testified falsely at petitioner's trial in identifying him as her assailant based on (1) her subsequent doubts about her identification, as variously articulated in her declarations, (2) the discrepancies between petitioner's physical appearance and her description of her assailant, as well as her description of her assailant's pickup truck and the circumstance that petitioner did not even own a similar truck at the time of the assault on Butler (as to which we view the newly discovered evidence of Michael Ratzlaff's assaults on other sex workers as providing significant context), and (3) her pattern of changing her testimony, especially her recent claim that petitioner molested her in jail. We also accept the referee's finding that Butler testified falsely at petitioner's trial (1) in her denial that she saw petitioner on TV before

identifying him, (2) in her denials relating to an expectation of leniency in exchange for her testimony, and (3) regarding the nature of the offense for which she was in custody at the time of trial. Each of these findings is supported by the evidence presented at the evidentiary hearing.

## D. Materiality and Relief Under Section 1473

" 'The statute [(§ 1473, subd. (b)(l))] and the prior decisions applying section 1473 make clear that once a defendant shows that false evidence was admitted at trial, relief is available under section 1473 as long as the false evidence was "material." ' " (*In re Figueroa, supra*, 4 Cal.5th at pp. 588-589.) "False evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that '*with reasonable probability* it *could have* affected the outcome . . . .' [Citation.] In other words, false evidence passes the indicated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different. [Citation.] The requisite 'reasonable probability,' we believe, is such as undermines the reviewing court's confidence in the outcome." (*In re Sassounian* (1995) 9 Cal.4th 535, 546.)

The Attorney General argues that relief is not warranted here because there was no reasonable probability that a different result would have been reached at the penalty phase in the absence of Butler's false identification. We are not persuaded.

The Attorney General appears to contend that petitioner has not established that Butler's testimony was the deciding factor in the jury's penalty-phase verdict. Petitioner's burden, however, is not to show that Butler's testimony "was the deciding factor." His burden is to show that the possibility of a

different verdict is "a chance great enough, under the totality of the circumstances, to undermine our confidence in the outcome." (*In re Roberts*, *supra*, 29 Cal.4th at p. 742.)

Preliminarily, we observe that the Butler evidence played a role in the prosecutor's closing argument to the jury. In her very brief argument (spanning just over six pages in the reporter's transcript), the prosecutor mentioned Butler's testimony only once, but she did so in a manner calculated to bring out the emotional power of the testimony: "You heard the testimony of Tambri Butler describing David Rogers, the defendant, who has no problem at all using violence against her. You heard her describe a man who took a gun, held it across in front of her nose and pulled the trigger to get what he wanted. [¶] Can you imagine the fear she must have felt when that happened?" Although the mention was brief, the prosecutor's dramatic invocation of Butler's terror in her argument added to the likely impact of Butler's testimony on the jury.

The totality of the relevant circumstances also includes the other evidence, aggravating and mitigating, presented in the penalty phase. The Attorney General contends that "even if Butler's testimony was impactful, the almost complete lack of mitigating circumstances, combined with several substantial aggravating circumstances, made it not reasonably probable that had Butler's testimony not been included in the penalty phase that the jury would have decided against a death sentence." The Attorney General concludes that "[s]imply put, the aggravating circumstances in this case, even without Butler's testimony, far outweighed anything [petitioner] presented in mitigation; there was nothing saving [petitioner] from these murders. The jury would have sentenced him to death regardless of whether Butler testified . . . because the

49

aggravating circumstances far outweighed the mitigating circumstances."

Contrary to the Attorney General's contention, Butler's false testimony likely had a significant effect on the outcome of the penalty phase. The trial court's ruling on petitioner's automatic application for modification of the death verdict under section 190.4, subdivision (e) explains why. The trial court noted that both of petitioner's murders involved the use of force or violence, then added: "But I think that his actions with Tambri Butler shocked me almost more than any other case I have ever heard. [¶] The use of a cattle prod or the taser or whatever you call it, and the firing of the shot across the bridge of her nose, and requiring her to engage in all of these various and sundry sexual activities, that probably influenced the jury, in my view, and this court more than any other because not only has it happened once with Janine Benintende, twice with Tracie Johann Clark; we know that it happened with Angela [M.]; we know that it happened with Tambri Butler."

Petitioner's *Strickland* expert at the evidentiary hearing, David Coleman, also testified as follows: "Butler's evidence essentially was a surrogate for the two victims. There was very little known about some of the circumstances around the two victims' deaths. There was [petitioner's] confession, which could be viewed as self-serving, with regard to one case [Clark]. With regard to the other [Benintende], there was a dearth of evidence. . . . What Tambri Butler did was to essentially serve as a surrogate for those two victims in the courtroom and describe an incident which I believe the jury quite possibly thought was exactly the kind of incident or very similar to the incidents that the two victims had gone through. And it was horrifying. . . . [S]o it gave life to something that was absent

from the case. [¶] Now, independently of that, the actions described by Ms. Butler are so shocking that in and of themselves in a case where the whole point is [whether] this man should . . . die, . . . [this] made a terrible contribution to the conclusion that he should die."

We agree with these assessments of the likely impact of Butler's testimony on the penalty phase jury. The other aggravating evidence could be considered substantial: Petitioner, a sworn law enforcement officer, murdered two sex workers and in another incident detained a sex worker and took intimate photographs of her. We reject, however, the Attorney General's assertion that mitigating evidence was almost completely lacking. To the contrary, petitioner presented a substantial and multifaceted case in mitigation. It included testimony of a psychologist that petitioner had acted under extreme emotional disturbance caused by sexual and physical abuse in childhood — testimony that Butler's narrative of sadistic violence essentially negated — and of petitioner's brother, Dale Rogers, tending to corroborate the history of abuse. It also included testimony by petitioner's wife and stepdaughter describing petitioner's good qualities and their strong relationships with him. Several of petitioner's law enforcement colleagues also testified regarding his laudable performance as a deputy. Given this mitigating evidence, there is a reasonable probability that the added weight of Butler's false testimony on the aggravating side of the scale — recounting an especially brutal attack that could have led the jury to infer that the attacks on the two murder victims were similarly brutal — affected the jury's balancing of the sentencing factors and hence its penalty verdict. The false testimony here undermines our confidence in the outcome of the

trial and therefore was material. (*In re Roberts*, *supra*, 29 Cal.4th at p. 742.) Petitioner consequently is entitled to relief on this claim as to the penalty verdict, and we need not address here the other claims in our order to show cause.

## VI. DISPOSITION

The petition for writ of habeas corpus is granted insofar as it seeks relief from the judgment of death. The judgment of the Kern County Superior Court in *People v. David Keith Rogers*, 1988, No. 33477, is vacated to the extent that it imposes a sentence of death. The petition's remaining claims will be resolved by later order to be filed separately.

Upon finality of our opinion, the Clerk of the Supreme Court is to remit a certified copy of the opinion and the order to the Kern County Superior Court for filing, and respondent Attorney General is to serve a copy of the opinion on the prosecuting attorney. (See Pen. Code, § 1382, subd. (a)(2); see also *In re Sixto* (1989) 48 Cal.3d 1247, 1265-1266; *In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9.)

**CANTIL-SAKAUYE, C. J.**


**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Rogers

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S084292
**Date Filed:** July 15, 2019

_____

**Court:** Superior
**County:** Kern
**Judge:** Louis P. Etcheverry

_____

**Counsel:**

Law Office of Alan W. Sparer, Alan W. Sparer, Law Office of AJ Kutchins, AJ Kutchins, Nerissa Huertas; Chatfield & Reisman, Alex Reisman and Kate Chatfield for Petitioner David Keith Rogers.

Bill Lockyer, Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Robert R. Anderson and Gerald A. Engler, Chief Assistant Attorneys General, Mary Jo Graves, Acting Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, John G. McLean, George M. Hendrickson, Ryan B. McCarroll and Henry J. Valle, Deputy Attorneys General, for Respondent the State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

AJ Kutchins
Law Office of AJ Kutchins
P.O. Box 5138
Berkeley, CA  94705
(510) 841-5635

Henry J. Valle
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 322-4650